Argued on demurrer November 7, petitioner discharged December 27,
1917.

## HALL *v.* JOHNSON.*

(169 Pac. 515.)

**Municipal Corporations—Ordinances—Validity.**

1. A municipal ordinance directed against conspiracies to injure
trade, business or commerce, and providing a penalty for violation
thereof, has no extramural effect, is not invalid on the ground that it
is not local, special and municipal legislation.

**Municipal Corporations—Ordinances—Rules of Evidence—Validity.**

2. While the legislature may declare that certain evidentiary facts
shall be *prima facie* evidence, such facts must have some direct and
logical tendency to prove the antecedent fact, hence a municipal ordi-
nance declaring that if any person shall alone, or in company with
others, loiter or parade back and forth in front of or cause any other
person or persons to loiter or parade back and forth in front of, or in
the vicinity of, any store, factory, works or place of business, or in
front of, or in the vicinity of, the home of any person connected with,
employed in or seeking employment in any such store, etc., such con-
duct shall be *prima facie* evidence of a conspiracy to injure the trade,
business or commerce of the proprietor of the store, etc., thus pa-
trolled, is invalid, because the acts have no tendency to prove a con-
spiracy to injure the commerce or trade of any person.

**Constitutional Law—Ordinances—"Conspiracy to Injure Trade, Busi-
ness or Commerce"—"Strikes"—"Boycott"—"Picketing."**

3. A municipal ordinance defined conspiracies to injure trade, busi-
ness or commerce as any combination or agreement between two or
more persons not to buy from or sell to, or have dealings with any
person or persons, or to induce or attempt to induce other persons not
to buy from or have dealings with any person or persons, etc., for the
purpose or with the intent to compel or force employment or discharge
from his employment. The ordinance further declared that if any
person alone or in company with others shall carry or display, or cause
to be carried or displayed, print or circulate, or cause to be printed
or circulated, any banner, sign, etc., which by its terms directly or
indirectly induces or attempts to induce others not to buy from or sell
to or have dealings with any designated person, or shall loiter or
parade back and forth, or cause any person or persons to loiter or
parade back and forth, in front of, or in the vicinity of, any store,
etc., such conduct shall be *prima facie* evidence of a conspiracy to in-
jure the trade or business of the person or persons referred to by the
banner, etc., or whose property is thus patrolled. A "strike" is defined
as the act of a body of workmen employed by the same master in stop-
ping work all together at a prearranged time, and refusing to continue
until some concession is granted by the employer, while a "boycott"
is defined as a combination to cause a loss to one person by coercing
others against their will to withdraw from him their business inter-
course, by threats that unless others do so, the combination will cause

---

*Authorities discussing the legality of picketing are collated in notes
in 4 L. R. A. (N. S.) 302; 50 L. R. A. (N. S.) 412.

On lawfulness of boycott by other than labor union, see note in 33
L. R. A. (N. S.) 1034.                                    REPORTER.

similar loss to them. *Held*, that the ordinance, even though valid as applied to "picketing," which is defined as posting members of a trade union on a strike at all the approaches to works for the purpose of observing or reporting the workmen going to or coming from the works, and of using such influence as may be in their power to prevent the workmen from accepting work there, it is invalid in depriving workmen of their right to strike *en masse;* that right having been recognized for many years.

[As to strikes and strikers, and what is unlawful interference or intimidation, see note in 61 Am. St. Rep. 706.]

Criminal Law—Prohibition—Nature of Acts Which can be Prohibited.

4. It is fundamentally true that whatever may be enjoined by a court of equity may by legislation be declared *malum prohibitum.*

Original proceeding in Supreme Court.

Petition by Earl Hall against N. F. Johnson, as Chief of Police of the City of Portland, for a writ of *habeas corpus.* Hearing upon demurrer to the petition and plaintiff discharged. The facts involved are set forth in the opinion of the court. Petitioner discharged.

For the plaintiff there was a brief with oral arguments by *Mr. W. S. Uren* and *Mr. Charles E. S. Wood.*

For defendant there was a brief with oral arguments by *Mr. Walter P. La Roche,* City Attorney, and *Mr. Stanley Myers,* Deputy City Attorney.

As *amicus curiae* there was a brief and an oral argument by *Mr. Harold M. Sawyer.*

In Banc. MR. JUSTICE BENSON delivered the opinion of the court.

This is an original proceeding based upon petition for a writ of *habeas corpus.* The petitioner was convicted in the municipal court of the City of Portland of a violation of an ordinance which reads as follows:

"Ordinance No. 33033.

"An ordinance defining conspiracies to injure trade, business or commerce, and providing a penalty for the violation thereof.

"The City of Portland does ordain as follows:

"Be it enacted by the people of the City of Portland as follows:

"Section 1. A conspiracy to injure the trade, business or commerce of any person doing business in the City of Portland is hereby defined as any combination of, or agreement between, two or more persons:

"(a) Not to buy from, or to sell to, or have dealings with, any person or persons in the City of Portland; or "(b) To induce, or attempt to induce, others not to buy from, sell to, or have dealings with, any person or persons in the City of Portland; for the purpose or with the intent to prevent any person from employing any person, or for the purpose or with the intent to compel or force any person to employ or discharge from his employment anyone, or to compel or force any person to alter his mode of carrying on his business, or to limit or increase the number of his employees, or their rate of wages or their time of service.

"Section 2. It shall be unlawful for any person to enter into, assist or participate in any conspiracy to injure the trade, business or commerce of any person doing business in the City of Portland, and upon conviction of a violation of this ordinance in the Municipal Court of the City of Portland, such persons shall pay a fine of not less than ten dollars nor more than five hundred dollars, or be imprisoned in the city jail for not less than five days nor more than six months, or shall be both fined and imprisoned.

"Section 3. If any person shall, alone or in company with others:

"(a) Carry or display, or cause to be carried or displayed, print or circulate, or cause to be printed or circulated any banner, sign, transparency, writing, printing, dodger, card, notice, sticker, button or sash, which by its terms or appearance, directly or indirectly induces or attempts to induce others not to buy from, sell to, or have dealings with, any designated person or persons doing business in the City of Portland; or

"(b) Loiter or parade back and forth, or cause any other person or persons to loiter or parade back and forth in front of or in the vicinity of any store, factory, works or place of business in the City of Portland, or in front of or in the vicinity of the home of any person in the City of Portland connected with, employed in, or seeking employment in, any such store, factory, works or place of business; such conduct shall be *prima facie* evidence of a conspiracy to injure the trade, business or commerce of the person or persons designated or referred to by or in any such banner, sign, transparency, writing, printing, dodger, card, notice, sticker, button or sash or of a conspiracy to injure the trade, business or commerce of the proprietor of the store, factory, works, or place of business, whose premises or home, or the home of whose employees or of those seeking employment in his store, factory, works or place of business, shall have been thus patrolled, and shall also be *prima facie* evidence of participation in such conspiracy by the person so conducting himself.

"Section 4. The words 'any person doing business in the City of Portland,' 'any person,' 'anyone' and 'proprietor' whenever used herein, shall include the plural as well as the singular, individuals of either sex, and also any partnership, association, domestic or foreign corporation or joint stock company."

1, 2. The questions presented for our consideration involve the validity of the ordinance under which the petitioner is imprisoned. An analysis of the ordinance discloses that it consists of: (1) A definition of what is to be deemed to constitute a conspiracy to injure the trade, business or commerce of any person doing business in the City of Portland; (2) declaring such conspiracy a crime and fixing the punishment; (3) enumerating certain acts the performance of any one of which is to be *prima facie* evidence of such a conspiracy. It will be at once noted that this legisla-

tion in effect makes it unlawful for workmen to strike, or to solicit others to strike, or to solicit others from accepting employment from any person doing business in the City of Portland. By Section 3, picketing is made *prima facie* evidence of the substantial offense. It is urged that this is not local, special and municipal legislation within the terms of the state Constitution, but we are unable to concede this point, since its influence is limited to the municipality by which it was enacted and it could not in any event have an extramural effect. It is contended that it is an attempt by a local law to regulate the practice in courts of justice, in setting aside the legal presumption of innocence, by declaring what evidence shall be proof of guilt, without regard to whether such evidence satisfies the court or jury beyond a reasonable doubt that the accused is guilty. This point is of course aimed at Section 3 of the act. There are a few authorities which appear to support this contention, but the great weight of authority is opposed to it, and this court has definitely adopted the other view. In a case recently decided by this court, *Elliott* v. *Tillamook County,* 86 Or. 427 (168 Pac. 77), Mr. Justice Moore says:

"The legislature in prescribing rules governing the trial of civil causes, may enact that certain resulting evidentiary facts related to, and having a tendency to establish the existence of some preceding fact can properly declare that the subsequent fact affords *prima facie* evidence of the antecedent fact, and such enactment will be upheld, notwithstanding the burden of proof is thereby shifted to the adverse party, since he is not concluded thereby, but may introduce evidence tending to rebut the disputable presumption thereby created."

Again, in *State* v. *Randolph,* 85 Or. 172 (166 Pac. 555), a criminal case, Mr. Justice Harris says:

"No additional force is given to the contention of the defendant when it is argued that the act of 1915 changes prior rules of evidence. The state has the power to alter rules of evidence. Stated in general terms, the accepted rule is that a person does not have a vested right in a rule of evidence; and therefore the legislature has power to alter or create any rule of evidence so long as it leaves a party a fair opportunity to establish his case or defense, and give in evidence all the facts legitimately bearing on the issues in the cause."

The following cases sustain the doctrine: *State* v. *Hamilton,* 80 Or. 562 (157 Pac. 796); *State* v. *Kline,* 50 Or. 426 (93 Pac. 237); *State* v. *Fisher,* 53 Or. 38 (98 Pac. 713). However, the power of the law-making body is limited in this respect, in that the facts declared to be *prima facie* evidence must have some direct and logical tendency to prove the antecedent fact, and when subjected to this test, it will be seen that subdivision (b) of Section 3 of the ordinance under consideration is subject to the criticism that, standing alone, the acts there recited have no logical tendency to prove the crime defined in the preceding sections and this paragraph is therefore invalid.

3. It is next urged that the ordinance is unconstitutional because it is an unreasonable invasion of personal liberty and private rights, and is in conflict with the well-defined public policy of this state and of the United States, and this contention presents the serious question for our consideration. This legislation was frequently referred to in the argument as an "anti-picketing ordinance," but we must not lose sight of the fact that it is very much more than that. Disregarding the structural character of the enactment, and seeking for its purpose and import, we observe that it is so designed as to prohibit strikes, boycotts

and picketing. The sense in which we shall use the word "strike" herein is found in Black's Law Dictionary in these words:

"The act of a body of workmen employed by the same master, in stopping work all together at a pre-arranged time, and refusing to continue until higher wages or shorter time, or some other concession is granted to them by the employer."

A "boycott" has been defined as:

"A combination to cause a loss to one person by co-ercing others against their will to withdraw from him their beneficial business intercourse, by threats that unless those others do so, the combination will cause similar loss to them, or by the use of such means as the infliction of bodily harm on them, or such intimidation as will put them in fear of bodily harm": Martin, Modern Law of Labor Unions, § 67.

Probably as fair a definition of "picketing" as may be found is that in Black's Law Dictionary:

"Picketing, by members of a trade union on strike, consists in posting members at all the approaches to the works struck against, for the purpose of observing and reporting the workmen going to or coming from the works, and of using such influence as may be in their power to prevent the workmen from accepting work there."

These definitions justify our statement that the ordinance is designed to prevent all three. We direct our attention particularly to the strike feature. Subsections a and b of Section 1 denounce any agreement between two or more persons

"not to buy from, sell to, or have dealings with, any person or persons in the city of Portland; or to induce, or attempt to induce, others not to buy from, sell to, or have dealings with, any person or persons in the city of Portland; for the purpose or with the intent

to prevent any person from employing any person, or for the purpose or with the intent to compel or force any person to employ or discharge from his employment anyone, or to compel or force any person to alter his mode of carrying on his business, or to limit or increase the number of his employees, or their rate of wages or their time of service.''

An agreement not to have dealings with a person is involved in a combination of workingmen, acting in concert, to quit their employment, and such action constitutes a strike. That such is the interpretation placed upon the language of the act by the defendant city, is manifest upon reading the charging part of the complaint in the instant case which reads thus:

"The said defendant Earl Hall, on the 29 day of September, 1917, in the city aforesaid, did willfully and unlawfully enter into, assist and participate in a conspiracy to injure the business of Willamette Iron & Steel Works, a corporation doing business in Portland, Oregon, as follows, to wit: Said defendant did then and there enter into a combination or agreement with Alex B. Larson, W. L. Martin and Arthur Ulch to induce or attempt to induce others not to have any dealings with said corporation for the purpose and with the intent to compel said corporation to alter its mode of doing business, said defendant then and there agreeing and combining with said Alex B. Larson, W. L. Martin and Arthur Ulch to induce and attempt to induce, by picketing said corporation, the employees of said corporation who are not members of a labor union organization to quit work for and not to have dealings with said corporation and to join said defendant as members of a voluntary unincorporated labor union organization, and to continue to refuse to work for or to have dealings with said corporation until it shall agree to make such concessions concerning wages, hours, working conditions and grievances generally as will be acceptable to the workers and members of

said labor union organization, the present mode of carrying on business by such corporation being to refuse to receive or consider any such questions or controversies concerning wages, hours of labor, working conditions or other grievances with any person or persons as representatives of a labor union organization within the corporate limits of said City of Portland, Oregon, whereby the peace and quiet of said city was disturbed contrary to the ordinance in such case made and provided.''

The question presented is: Can a municipality, in the exercise of its police power, enact legislation declaring the act of striking to be criminal. The problem before us is not at all a new one. Indeed, it is as old as the endless struggle between the employer and the employee. Legislatures as well as courts have sought to solve it, and with varying success. In 1875 the Parliament of England enacted an affirmative statute declaring that an agreement or combination by two or more persons to do or procure to be done any act in contemplation or furtherance of a trade dispute between employer and workmen is not to be indictable as a conspiracy, if such act committed by one person would not be punishable as a crime. The same legislation has been substantially adopted by twelve of our own states: California Penal Code, 581; Colorado, Revised Statutes, Section 3924; Maryland, Section 33, Art. XXVII, Pub. Gen. Laws; Minnesota, Section 4868, Revised Laws; Nevada, Section 6801, Revised Laws; New Jersey, Compiled Statutes, p. 3051; New York, Section 582, Consolidated Laws; N. Dak. Revised Codes of 1905, Section 8770; Oklahoma, Section 3764, Revised Laws; Pennsylvania Digest, 484 and 2017; Texas, Arts. 5244 and 5245, Revised Civ. Stats.; W. Virginia, Chap. 78, Acts of 1907. Twenty states, including Oregon, have statutes declaring it a

crime to use force, threats, or intimidation in connection with labor disputes. Our attention has not been called to nor have we found a case wherein a municipality other than the City of Portland had legislated upon the subject. The 63d Congress, in 1914, passed an act providing that no restraining order should hereafter be granted by any court of the United States which should prohibit any person or persons, singly or in concert, from quitting their employment or peaceably persuading others to do so.

The ordinance which we are now considering is the only one we have been able to discover which seeks to prevent workmen from quitting their employment in a body. Neither have we been able to discover a case in any state in the Union which holds that such concerted withdrawal from employment is either unlawful *per se* or that it may be enjoined. It will not be disputed that every workman has an absolute right, in the absence of contract, to quit his employment when he pleases and that the employer has the reciprocal right to discharge a workman in like manner. The fact that a number of workmen exercise this right in common cannot, we think, make the act criminal. Such a contention is opposed to the spirit of our laws and form of government. It is contrary to the public policy of the nation as expressed in its statutes and the decisions of the courts. It is true that there was a time when the courts of England held that an agreement of workmen to quit work in a body for the purpose of securing better wages or improved conditions for labor, was a criminal conspiracy at common law, but this attitude may well be considered to have been a survival of the spirit which existed when Gurth, the Saxon swine-herd, wore an iron collar riveted about his neck, and more than forty years ago the English

Parliament repudiated this doctrine by an affirmative statute.  The act of quitting employment in a body cannot, in itself, involve any question of the public peace, health, or safety, unless it be complicated with some other problem as in time of war, and in such an emergency the problem is shifted to the state or federal government.  In this particular, then, the ordinance is unreasonable and void as against public policy as disclosed in legislation, and the decisions of both state and federal courts.

However, we do not wish to be understood as holding that if the legislation had been in fact what it has been called—an anti-picketing ordinance—that it would have been necessarily invalid.  The question of peaceable picketing is one that has been discussed frequently and for many years past, by the courts.  The judicial opinions have been conflicting, and it is difficult to determine accurately where the weight of authority falls.  All the authorities agree that picketing accompanied by threats, force and intimidation, is unlawful.  Many courts have held that peaceable picketing is not illegal, while many others have held, and we think, with reason, that there can be no such thing as "peaceable" picketing.  In *Pierce* v. *Stablemen's Union,* 156 Cal. 70 (103 Pac. 324), this view is expressed thus:

"A picket, in its very nature, tends to accomplish these very things.  It tends and is designed by physical intimidation, to deter other men from seeking employment in the places vacated by the strikers. It tends and is designed to drive business away from the boycotted place, not by the legitimate methods of persuasion, but by the illegitimate means of physical intimidation and fear.  Crowds naturally collect, disturbances of the peace are always imminent and of frequent occurrence.  Many peaceful citizens, men and

women, are always deterred by physical trepidation from entering places of business so under a boycott patrol. It is idle to split hairs upon so plain a proposition and to say that the picket may consist of nothing more than a single individual peacefully endeavoring by persuasion to prevent customers from entering the boycotted place. The plain facts are always at variance with such refinements of reason.''

The same view is expressed in *Barnes & Co.* v. *Chicago Typographical Union,* 232 Ill. 424 (83 N. E. 940, 13 Ann. Cas. 54, 14 L. R. A. (N. S.) 1018), as follows:

''There have been a few cases where it was held that picketing by a labor union of a place of business is not necessarily unlawful if the pickets are peaceful and well behaved; but, if the watching and besetting of the workmen is carried to such a length as to constitute an annoyance to them or their employer, it becomes unlawful. But manifestly that is not a safe rule, and furnishes no fixed or certain standard of what is lawful or unlawful. Any picket line must result in annoyance both to the employer and the workmen, no matter what is said or done, and to say that the court is to determine by the degree of annoyance whether it shall be stopped or not would furnish no guide, but leave the question to the individual motions or bias of the particular judge. To picket the complainant's premises was in itself an act of intimidation and an unwarrantable interference with their rights.''

In a very recent case, *St. Germain* v. *Bakery & Confectionery Workers' Union* (Wash.), 166 Pac. 665, the Supreme Court of the State of Washington has adopted this view, and in an able and extended discussion has abundantly justified its position. A particularly clear summary of the approved doctrine in that case is voiced in the luminous concurring opinion of Mr. Justice CHADWICK, in which, after quoting exten-

sively from the case of *Jones* v. *Leslie*, 61 Wash. 107
(112 Pac. 81, Ann. Cas. 1912B, 1158, 48 L. R. A. (N. S.)
893), he says:

"That statement of the law is enough to close this
controversy. Picketing is notice to the world that
organized labor has blacklisted an employer. If it be
wrong for the employer to take from the one who
labors his capital, which is his right to offer his ser-
vices in the market of labor, it is equally as wrong for
the laborer, acting either individually or collectively,
whether by peaceful or violent methods (for experience
teaches us that either way invites breaches of the
peace), to take from the employer the right to pursue
his business unrestrained, so long as he does not vio-
late the law of the land. The gist of the case does not
lie in the manner in which either side proceeds to re-
dress its wrongs, but the test is to be found in answer
to the question whether under any set of circumstances
a court of equity should affirm the *ex parte* judgment
of a person or body of men acting extrajudicially, and
put in his hand, or their hands, whether employer or
employee, a roving commission to go out and redress
a wrong, either real or fancied, in their own way."

4. It is true that all of these are chancery cases
wherein an injunction was sought, but it is funda-
mentally true that whatever may be enjoined by a court
of equity may by legislation be declared *malum pro-
hibitum.*

The ordinance, however, not only denounces picket-
ing, but includes voluntary abandonment of employ-
ment by workmen acting together, and the two are so
woven together as to make the entire act void.

It follows that the petitioner must be discharged
from custody and it is so ordered.

PETITIONER DISCHARGED.