[Civil No. 1544.   Filed March 5, 1918.]

[171 Pac. 121.]

WILLIAM TRUAX and WILLIAM A. TRUAX, Copart-
ners Doing Business Under the Firm Name and Style
of WILLIAM TRUAX, Appellants, v. BISBEE LOCAL
No. 380, COOKS' AND WAITERS' UNION, JACK
BARNETT et al., Appellees.

1 PLEADING—CONCLUSIONS.—In complaint alleging that defendant's "un-
lawfully and maliciously conspired and combined" to boycott plain-
tiffs in their restaurant, the quoted words are mere adjectives, de-
scribing the pleader's conception of the combination formed by
defendants to prosecute the strike to a successful conclusion.

2. CONSPIRACY—INTERFERENCE WITH EMPLOYER—STRIKE.—The forma-
tion of a combination for the purpose of declaring a strike, and by
concerted action of the persons combining prosecuting such strike to
a successful conclusion, amounts to an unlawful and malicious con-
spiracy and combination only where the object is the accomplish-
ment of a crime or some unlawful purpose, or a lawful purpose by
criminal or unlawful means.

3. TRADE UNIONS—PEACEFUL STRIKES.—The right of workingmen to
organize a union of their craft for the purpose of improving work-
ing conditions of the members and to maintain such improved con-
ditions by peaceful means cannot be questioned.

4. TRADE UNIONS—STRIKES.—Where men in plaintiffs' employ who are
members of defendant union quit their employment because plain-
tiffs refused to pay them satisfactory wages and allow satisfactory
hours within which to work, a strike through defendant to induce
plaintiffs to grant the demands of the employees was lawful.

5. INJUNCTION—INTERFERENCE WITH EMPLOYER—PUBLICATION OF EX-
ISTENCE OF STRIKE.—The mere publication of the existence of a
strike by trade union and of its causes in a thorough manner is no
ground for equitable interference on suit of employer.

6. MASTER AND SERVANT—CAUSING EMPLOYEES TO QUIT SERVICE.—Where
no contract existed requiring members of defendant union in plain-
tiffs' service to continue work, defendant union violated no right of
plaintiffs' by causing such members to quit their employment.

7. TRADE UNIONS—BOYCOTT.—The members of defendant union violated
no right of employers by refusing to deal with them, there being
no vested right in patronage of union members.

8. MASTER AND SERVANT—INTERFERENCE WITH EMPLOYEES.—Plaintiffs,
employers, had the legal right to conduct their business in their own
way, and any attempt to interfere therewith violated a legal right.

9. MASTER AND SERVANT—INTERFERENCE WITH EMPLOYERS.—An appeal, by one deeming himself injured by the system adopted by employers in conducting their business, to his friends and to members of and sympathizers with a union to which he belongs, requesting such persons to cease dealing with the employers, cannot fairly be termed an interference with the methods adopted by the employers for conducting their business.

10. INJUNCTION — PEACEFUL PICKETING.—Under Civil Code of 1913 paragraph 1464, prohibiting courts from granting restraining orders to prohibit any person or persons "from attending at or near a house or place where any person resides or works, or carries on business, or happens to be for the purpose of peacefully obtaining or communicating information, or of peacefully persuading any person to work or to abstain from working, or from ceasing to patronize or employ any party to such dispute, or from recommending, advising, or persuading others by peaceful means so to do" peaceful picketing, cannot be restrained.

11. INJUNCTION — PEACEFUL PICKETING — QUESTION OF FACT.—Under Civil Code of 1913, paragraph 1464, whether picketing is peacefully carried on is a question of fact.

12. APPEAL AND ERROR—FINDINGS SUPPORTED BY SUBSTANTIAL EVIDENCE —REVIEW.—When the trial court has determined that picketing is peaceful, and there is substantial evidence in the record in support of such determination, the appellate court will not interfere.

13. INJUNCTION — PEACEFUL PICKETING — EVIDENCE.—Evidence *held* to justify court's finding that defendants were engaged in "peaceful" picketing about plaintiffs' place of business.

14. INJUNCTION—INTERFERENCE WITH EMPLOYERS—FREEDOM OF SPEECH. Under Constitution, article 2, section 6, providing that "every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right," a court of equity cannot restrain members of a labor union from speaking, writing, and publishing on the subject of dispute between the union and employers of its members, although the members are unable financially to respond in damages for abuse of the right.

[As to what constitutes legal justification for strike of employees, see note in Ann. Cas. 1912C, 1302.]

APPEAL from a judgment of the Superior Court of the county of Cochise. Alfred C. Lockwood, Judge. Affirmed.

STATEMENT OF FACTS BY THE COURT.

The appellant commenced this action to enjoin the defendant from advertising a labor strike and from appealing to union members and sympathizers by means of banners, hand-

bills, circulars, and street talks to cease dealing with plaintiffs upon the grounds that the plaintiffs are injured in their business and the defendants are insolvent and unable to respond in damages, and that the plaintiffs have no other speedy, adequate remedy. The cause was tried on its merits, and the court rendered judgment for the defendants. The plaintiffs appeal.

Mr. Alexander Murry and Mr. Clifton Mathews, for Appellants.

Mr. William B. Cleary, for Appellees.

CUNNINGHAM, J.—This action arises out of a dispute between the plaintiffs and defendant Bisbee Local No. 380, Cooks' and Waiters' Union, with regard to wages and hours of employment of cooks and waiters in plaintiffs' restaurant business. The plaintiffs had in their employ 10 members of the said defendant union at the union wage scale and hours. On or about April 9, 1916, plaintiffs notified all of their employees that the rate of wages and hours of employment would be changed and effective on April 10, 1916. The difference between the wages paid up to the tenth day of April, 1916, and the wages the plaintiffs proposed to pay thereafter and the hours required, nowhere appears in the record.

The defendant union contended for a continuation of the same hours and wages per day. No agreement with respect to said proposed changes in wages and hours of work having been reached by the defendant union and the plaintiffs, on April 10, 1916, all of the defendant union members quit plaintiffs' employment. Thereupon defendant union declared a strike existed, and proceeded to advertise such strike. In advertising the said strike the defendant union put out "pickets," and caused the said pickets to carry banners near the front entrance of plaintiffs' business place, the English Kitchen. The said banners had printed thereon in large letters, "so that the wording thereon could be seen from across the street, and from a considerable distance up and down the street," the following: "The English Kitchen Unfair to Cooks and Waiters and Warren District Trades Assembly." This banner and similar banners were carried up and down the street in front of said English Kitchen during the days and

during the nights until the business closed. For a period of four days immediately following the strike similar banners were carried about the district on burros. Also handbills or circulars were handed to persons on the street near the said place of business. The members of defendant union or sympathizers with their actions in the premises frequently talked about the matter, and loudly advised all friends of organized labor to desist from patronizing the English Kitchen.

The plaintiffs' exhibit, with their supplemental complaint, 14 of said circulars distributed about the streets, 11 of which close with the appeal, "Help us win," or words to the same effect. The other three circulars contain statements of the strike situation as other purported incidents are supposed to affect it.

The exhibits are very similar in language used, but no good purpose will be served in producing them here. For the purpose of illustration of the appellants' contention, I present Exhibits "D" and "K" as more nearly covering all of such complaint. Exhibit "D" is as follows:

"12 Hours Bill Truax.

"Billie Truax contends that it is impossible to operate a restaurant on the eight-hour basis and make it pay. Witness every other restaurant in the' Warren district operating satisfactorily on the eight-hour basis.

"Why does Bill Truax employ scab Mexican painters? The truth is very obvious, it is cheaper and hastens the day when he 'has it made,' and can return to that dear Los Angeles, be a gentleman, perhaps have a Japanese valet, a Chinese cook, and an imported Jamaican chauffeur.

"Don't overlook the fact that Bill Truax's past record relative to Union Labor is not an unblemished tablet of stone, but nevertheless it is quite as enduring, and he will find it writ in letters large wherever he tries to do business in this U. S. A.

"The need and the necessity of the workers to organize and conduct their negotiations with the employers on a collective bargaining basis is denied by few. That is just where it 'gets to' Bill Truax; his autocratic methods in handling his help, chasing them down the street with a butcher knife, and other stunts of a like nature will have to go, and *believe us, it hurts.*

"Remember either yourself, your father, brother, or even your sister may some time want to better their economic conditions, and we pledge ourselves to help you if we can, and not a single member of the allied trades or Cooks and Waiters' Union will ever scab on you. Help us win.

"Cooks' and Waiters' Union and Warren District Trades Assembly. Ore—Union—Printers."

Exhibit "K" is as follows:

"To every man, woman, and child and all lovers of fair play:

"We are fighting the most consistent 'bad actor' in the district, Wm. Truax.

"Wm. Truax fought the eighty per cent. law. (Please don't overlook this fact.)

"Wm. Truax always favored hiring foreigners almost exclusively.

"Wm. Truax now sees the possibility of the Greek peril.

"We say better an eight-hour camp and a fair wage than a 10 or 12 hour camp and a fair wage a la Bill Truax.

"Wm. Truax is not being discriminated against, but we do want gilt-edged assurance that Bill Truax will keep and abide by the terms of his next contract with the Cooks' and Waiters' Union.

"Wm. Truax initiated this fight, and we are going to see it through now that it has been forced upon us. When you patronize Bill Truax you are aiding and abetting a diminutive but potential force for evil in tearing down the wages and hours in this district.

"Help us win.

"Cooks' and Waiters' Union and Warren District Trades Assembly. Union—Ore—Printers."

By the use of the circulars, handbills, and banners and the street talks, the defendants and their sympathizers advertised the existence of the strike, and appealed to the public in general, and to all persons allied with and friendly to organized labor in particular, to help the defendant union win the strike. The nature of this help requested at all times was to cease patronizing the plaintiff's business, the English Kitchen Restaurant, until the strike should be settled. The defendants made known to the general public the existence of the strike and its cause by stating that the plaintiffs are "unfair" to organized labor.

These conditions existing, and defendants threatening to continue along the same course of publicity by the use of the same means to win the strike, and the plaintiffs' business having diminished in volume, this action was commenced to restrain defendants from their activities above referred to. In their complaint the plaintiffs allege that on or about the tenth day of April, 1916, the defendants named, and numerous other persons, whose names are unknown to plaintiffs, and all of whom were, and now are, acting in concert with the defendants, "unlawfully and maliciously conspired and combined to inaugurate, and did inaugurate, in the said city of Bisbee, a deliberate and active campaign to boycott plaintiffs and their restaurant, the English Kitchen, and conspired and combined to induce, and by threats, menace, coercion, intimidation, and persuasion did induce, large numbers of plaintiffs' customers, patrons, and other persons . . . to quit or refrain from patronizing and trading with plaintiffs in their said place of business, the English Kitchen, in consequence . . . plaintiffs have suffered injury." The complaint thereafter sets forth a number of alleged specific overt acts in furtherance "of said unlawful conspiracy and combination." The plaintiffs allege that the defendants, their agents and such other persons acting in concert with them, have threatened, and do now threaten, to continue to harass and oppress plaintiffs in the conduct of their said business, and to continue said "unlawful campaign and design to boycott plaintiffs and their said restaurant, the English Kitchen." The complaint further alleges that for plaintiffs to seek to recover damages from said defendants would involve a multiplicity of suits; "that . . . each and all of said defendants are insolvent, and therefore each and all of said defendants are and will be wholly unable to respond in damages to these plaintiffs for any injury or damages to these plaintiffs from their aforesaid wrongful and unlawful acts and conduct."

The relief demanded is a writ of injunction enjoining, restraining, and prohibiting defendants, etc., "from in any manner or by any means conspiring or combining to boycott the business of plaintiffs, and from threatening or declaring any boycott against said business, and from abetting, aiding, or assisting in any such boycott, and from, directly or indirectly, threatening, coercing, menacing, intimidating, or persuading any person or persons whomsoever from buying from

or otherwise dealing with plaintiffs, and from printing, publishing, or displaying any sign, banner, or other device for the purpose of advertising or in furtherance of any boycott against plaintiffs' business, and from referring, either in print or otherwise, to plaintiffs as unfair, in furtherance of such boycott.''

The defendants made answer by demurring to the complaint upon the grounds that the facts stated do not authorize equitable relief; they admit the existence of the union; they admit that the strike was declared and maintained by the union, and by friends of the union acting in concert, to the end of causing the plaintiffs to comply with the demands of the defendant union and its members, former employees of plaintiffs. Defendants deny that their intentions, purposes, and motives in the use of the means employed are unlawful, and they allege that the purpose of the strike and boycott was and is for that of improving the conditions and hours of employment of the members of defendant union.

The cause was heard by the court on the pleadings, stipulations, and oral testimony. Wm. Truax, a witness in behalf of plaintiffs, and one of the plaintiffs, testified, in substance, that members of the defendant union interfered with plaintiffs' business by going to certain business men in Bisbee, and telling such business men that if any of their (such business men's) employees are caught going into the English Kitchen that they (the union) would put a ban on them (such business men); also, the plaintiffs' business was interfered with by the defendants causing banners to be carried up and down the street in front of plaintiffs' business place and by defendants declaring to people that plaintiffs are ''unfair'' to organized labor and to the union. The banners were displayed in front of plaintiffs' business place about 12 hours a day for a week or so up to the time witness was called to testify. The defendants' answer concedes these facts. This witness further testifies as follows:

''At the time this trouble came up I had ten of the members of the waiters' union working for me. We made them a proposition of a scale of wages to go into effect on Tuesday morning. This trouble did not arise out of any objection that the ten men working for me had. They were some outsiders. These ten men working for me were satisfied with

what they were doing. . . . These ten men went out. . . . At the time that the dispute arose it was between ourselves and the union and the cooks and waiters in Bisbee. . . . When we and the union did not come to terms, they quit. . . . We had a difficulty over something with the union itself, and we and the union did not agree, and then because we did ·not agree with the union these men quit, . . . and since that time we and the union have failed to come to an agreement. That is the situation, . . . I never saw them have any fights in front of our place. . . . So far as I know, everything that was done there was done quietly, with the exception of going in and telling people as I stated.''

The use of the words, ''unlawfully and maliciously conspired and combined,'' are mere adjectives describing the pleader's conception of the nature of the combination formed by the defendants for the purpose of declaring a strike, and, by concerted action of the persons combining, prosecute such strike to a successful conclusion. Such organized concerted action amounts to an unlawful and malicious conspiracy and combination only in such cases as the object of the combination is to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means. *Pettibone* v. *United States,* 148 U. S. 197, 37 L. Ed. 419, 13 Sup. Ct. Rep. 542.

The right of workingmen to organize a union of their craft, for the purpose of improving the working conditions of the members of such organization, and to maintain such improved conditions by peaceful means, is so firmly fixed in the decided cases and in reason that such rights cannot now be seriously questioned by an enlightened court. See *Thomas* v. *Cincinnati, N. O. & T. P. Ry. Co.* (C. C.), 62 Fed. 802, 817; *National Protective Assn.* v. *Cummings,* 170 N. Y. 315, 88 Am. St. Rep. 648, 58 L. R. A. 135, 63 N. E. 369; *Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550, 98 Pac. 1027; *Hall* v. *Johnson,* 87 Or. 21, 169 Pac. 515.

The purpose of the defendant Bisbee Local, No. 380, Cooks' and Waiters' Union in organizing is beyond dispute, and such purpose is no other than to improve the working conditions of members of the organization. Consequently the agreement holding the defendants to a concerted action, and the purpose of the agreement, are, without question, both lawful.

We are left to inquire whether the means adopted to accom-
plish such lawful purpose of bettering the working conditions
of cooks and waiters is lawful.  The means adopted to accom-
plish such purpose was the strike, a so-called boycott of the
plaintiffs' business, and the placing of pickets near the front
entrance of plaintiffs' restaurant.

The circumstances leading up to the strike are detailed by
the plaintiff William Truax, testifying as a witness as above
set forth.  Ten of the members of defendant union were
working for plaintiffs prior to April 10, 1916.  On the ninth
day of April, 1916, plaintiffs notified their employees that
beginning on the 10th, the succeeding day, the wages of em-
ployees and the hours of employment would become different
from the wages and hours theretofore paid and required.
These changes had been the subject of discussion with the de-
fendant union officers.  The plaintiffs and the union had a
"difficulty" over "something," "and we and the union did
not agree, and then because we did not agree with the union
these men quit."  The fair inference to be drawn from this
testimony is that the difficulty referred to is the dispute with
regard to the scale of wages and hours of employment.  These
are the matters the plaintiffs and defendant union were not
able to agree upon.  The fact remains that the men in plain-
tiffs' employ, who are members of defendant union, quit such
employment because the plaintiffs refused to pay them satis-
factory wages for their work, and refused to allow such em-
ployees satisfactory hours within which to perform their
work.  Hence the strike to induce the plaintiffs to grant the
said demands of the employees, made by and through the
defendant Cooks' and Waiters' Union, was lawful in the cir-
cumstances shown to exist and the object sought.  See *Rail-
road Co.* v. *Bowns,* 58 N. Y. 573; *Longshore Printing Co.* v.
*Howell,* 26 Or. 527, 46 Am. St. Rep. 640, 26 L. R. A. 464, 38
Pac. 547, 551.

The means employed by the promoters of the strike, viz.,
the alleged boycott, and the activity of the union pickets en-
gaged in advertising the existence of the strike and boycott,
are questions of greatest difficulty.  The questions presented
in connection with these matters have been before the courts
in a great number of cases, and the courts of equal respect
have arrived at opposite conclusions.  These conflicting deci-
sions cannot be reconciled upon any principle of law.  The

definitions of "boycott," as the word has been defined in the many cases, are nearly as varied as the cases defining the term. The supreme court of California in *Pierce* v. *Stablemen's Union*, 156 Cal. 70, 103 Pac. 324, adopts a meaning for the word which meets with my approval. That court says:

" 'After striking, the employee may engage in a "boycott," as that word is here employed. As here employed, it means not only the right to the concerted withdrawal of social and business intercourse, but the right, by all legitimate means of fair publication and fair oral or written persuasion, to induce others interested in, or sympathetic with, their cause to withdraw their social intercourse and business patronage from the employer. They may go even further than this, and request of another that he withdraw his patronage from the employer, and may use the moral intimidation and coercion of threatening a like boycott against him if he refuse so to do.' "

Referring to opposing authorities, with discussion, the court continues:

"In this respect this court recognizes no substantial distinction between the so-called primary and secondary boycott. Each rests upon the right of the union to withdraw its patronage from its employer, and to induce by fair means, any and all other persons to do the same, and, in the exercise of those means, as the unions would have the unquestioned right to withdraw their patronage from a third person who continued to deal with their employer, so they have the unquestioned right to notify such third person that they will withdraw their patronage if he continues so to deal. However opposed to the weight of federal authority the views of this court are, that they are not unique may be noted by reading *National Protective Assn.* v. *Cummings*, 170 N. Y. 315, 88 Am. St. Rep. 648, 58 L. R. A. 135, 63 N. E. 369; *Lindsay* v. *Montana Federation of Labor*, 37 Mont. 264, [127 Am. St. Rep. 722], 18 L. R. A. (N. S.) 707, 96 Pac. 127, where the highest courts of these states formulate and adopt like principles. . . . To say that a boycott is a 'conspiracy' immediately implies illegality, and puts the conduct of the boycotters under the ban of the law. So, also, does the definition which describes boycotting as 'illegal coercion,' designed to accomplish a certain end. As we have undertaken to define 'boycott,' it is an or-

ganized effort to persuade or coerce, which may be legal or illegal, according to the means employed.''

The means used to ''coerce and intimidate'' the plaintiffs in this case was the inauguration of a campaign of publicity, advertising the existence of the strike by the display of banners, by pickets, and the distribution of circulars and loud talking on the streets. The facts advertised and given publicity are that a strike against the English Kitchen existed; that the said strike was declared and maintained by the defendant Cooks' and Waiters' Union and the Warren District Trades Assembly; that the English Kitchen proprietors are ''unfair'' to organized labor, because said proprietors had refused and still refuse to grant union employees fair wages and fair working hours; upon these facts the defendants claim that, if the public in general and the union members in particular would cease to deal with plaintiffs, such persons so ceasing to deal with plaintiffs would thereby help win the strike.

The plaintiffs complain of injury to their business caused by the said campaign of publicity, conceding in their testimony that a strike exists and arose because of plaintiffs' refusal to grant the wages and hours demanded by defendant union for union members in plaintiffs' employ. Thereby the plaintiffs concede the existence of the facts advertised by the defendants.

No right of plaintiffs is violated by publishing facts. Certainly, if a dispute between plaintiffs and a labor union exists, and one of the plaintiffs so testifies, plaintiffs have no legal right to enforce the union to keep the facts secret. The extent of the publicity given such dispute is unimportant and violates no right of plaintiffs, either civil or criminal. If the publicity given the existence of the dispute results in a loss of patronage and business to plaintiffs, such loss is attributable to the dispute, and not attributable to the publicity given to the dispute.

Consequently the mere publication of the existence of a strike and of its causes in a thorough manner is no ground for equitable interference. Actionable language used and false statements made by one party to the dispute, tending to injure the other party to such dispute in advertising such dispute, is a matter that I will notice below. The appeal of defendants to the friends of organized labor and to the gen-

eral public to cease patronizing the plaintiffs, made in connection with the publication of the strike, is the boycott complained of in this action.

In this connection it is well to remember that the defendant union violated no rights of the plaintiffs in causing union members in plaintiffs' service to quit such employment. The workmen had the right to quit separately or in a body, without question, no contract to continue in the service being in existence, and having been forced to quit the service by the union would give plaintiffs no right to complain.

Likewise, the members of defendant union violated no right of the plaintiffs by refusing to deal with the plaintiffs. The plaintiffs had no vested right in the patronage of union members. As a consequence the union members, singly or as a body, had and have the legal right to refuse to transact any business with the plaintiffs for no cause whatever, and by such refusal no right of the plaintiffs is violated.

Plaintiffs have the legal right to conduct their business as suits them, and any attempt on the part of anyone to interfere with the free conduct of that business violates a right. An appeal by one deeming himself injured in some manner by the system adopted by the plaintiffs in conducting their business, to his friends and to members of and sympathizers with a union to which such an one belongs, requesting such friends, members, and the general public to cease from dealing with plaintiffs, cannot fairly be termed an interference with the methods adopted for the conduct of plaintiffs' business. I readily concede that if such an appeal is heeded, the result that naturally would follow would be a loss of profit in business transacted; but this effect, while persuasive of the advisability of a change in business methods, would in no sense be an interference with plaintiffs' methods of conducting their business. Consequently I am of the opinion that the defendants violated no right of the plaintiffs in declaring, through their advertising and publicity campaign, a concerted intention to cease all business and social intercourse with the plaintiffs during such time as the said labor dispute remained unsettled; and their appeal to organized labor in particular and the public in general to do likewise violated no legal right of the plaintiffs.

Plaintiffs' right to conduct their business according to their own plans and methods, without interference from any-

one, may be or may not be violated by "picketing." The defendants are charged with "causing certain persons to parade up and down Main Street immediately in front of said 'English Kitchen,' bearing a certain banner printed in large letters, . . . the following inscription, to wit, 'The English Kitchen Unfair to Cooks and Waiters and Warren District Trades Assembly'; that this banner and similar banners are borne by the persons having them in their possession during the day, and at night until said restaurant is closed, up and down the street for a space of about 15 or 20 feet immediately in front of said English Kitchen, and not more than 5 feet from the front entrance thereof, the same being the only entrance open to the general public." Plaintiffs do not charge that these men on parade in front of plaintiffs' place of business are placed there for the purpose of watching and annoying the men working for plaintiffs, not members of the union, and in that manner interfering with plaintiffs' business. The evidence coming from plaintiffs is that the persons placed near their place of business acted at all times peaceably. The alleged purpose for which the men were placed near plaintiffs' business entrance was to advertise the strike and influence prospective customers from patronizing plaintiffs.

Cases that have held picketing to be *per se* illegal, and that there can be no such thing as peaceable picketing (*Pierce v. Stablemen's Union*, 156 Cal. 70, 103 Pac. 324; *Barnes & Co. v. Chicago Typographical Union*, 232 Ill. 424, 13 Ann. Cas. 54, 14 L. R. A. (N. S.) 1018, 83 N. E. 940; *St. Germain v. Bakery etc. Union*, 97 Wash. 282, L. R. A. 1917F, 824, 166 Pac. 665; *Hall v. Johnson*, 87 Or. 21, 169 Pac. 515), deal with a state of facts wherein the purpose of the picketing was to watch and influence the employees working or persons seeking employment, and by causing men who were working to quit work, or preventing those seeking work from working. No case has been brought to my attention wherein the "picketing" was intended solely to affect prospective patrons and customers by causing such patrons and customers to change their minds and trade elsewhere. No court, so far as I have observed, has held such acts of union men "picketing." Yet the union agent who displays a banner advertising the existence of a strike against the place of business in front of which

the banner is displayed and paraded is commonly referred to as a "picket." Under the evidence in this case, as given by Wm. Truax, one of plaintiffs, the person carrying the display banners immediately in front of plaintiffs' business place "walks back and forth and does not say anything. He never speaks to anyone. One of them that carries the banner makes signs and in other ways attracts the attention of people, singing and whistling." On cross-examination the witness says: "I never saw them have any fights in front of our place or grab hold of anybody and pull them out. So far as I know, everything that was done there was done quietly, with the exception" of what witness was told by others.

Conceding that the persons who carried the banners were "pickets," then the purpose of such picketing was to advertise and make known to the public in general that a strike was on against the English Kitchen for the reason that the English Kitchen is "unfair" to organized labor. Whatever interference with plaintiffs' business the presence of the banner carriers caused, that interference did not arise from any boisterous conduct of the carriers. Their conduct was at least peaceable. Their presence near the English Kitchen is the only ground for complaint.

By the express terms of Civil Code of 1913, paragraph 1464, the courts are prohibited from restraining orders or injunctions the issuance of which prohibits any person or persons "from attending at or near a house or place where any person resides, or works or carries on business, as happens to be for the purpose of peaceably obtaining or communicating information, or of peaceably persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute; or from recommending, advising, or persuading others by peaceful means so to do. . . . " In the absence of this statute, a serious question would likely exist in this jurisdiction whether, as a matter of law, in the nature of things "peaceful" picketing may exist; but with paragraph 1464, *supra,* on our statute books, that question is eliminated as a question of law, and expressly made a question of fact during the existence of a labor strike; and, before the courts are permitted to interfere by injunction, the necessity must appear to prevent irreparable injury to property or property rights, and picketing in a peaceful

manner creates no such necessity for injunction interference by the courts.

Whether the picketing is peacefully carried on is a question of fact in this jurisdiction and, as is the case in all such matters, when the trial court has determined the question, and substantial evidence in support of the determination reached appears in the record, the appellate court will not interfere.

Under the evidence in this record, the court was justified in finding as a fact that the defendants were engaged in peacefully picketing about the plaintiffs' place of business.

Conceding that the statements on the banners, circulars, and language used in loud street talks, to the effect that plaintiffs are "unfair to organized labor"; that one of the plaintiffs, armed with a butcher knife, has a habit of chasing employees on the street; that plaintiffs habitually violate contracts with their employees, and other statements attributing to plaintiffs acts and characteristics which in their nature tend to bring plaintiffs into disrepute, contempt, or ridicule, yet the statements made are statements spoken or written and published on the subject of the strike pending by persons interested therein; and "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." Section 6, article 2, State Constitution.

If a court of equity may restrain and prohibit members of a labor union from speaking, writing, and publishing on the subject of a dispute between the union and employers of its members,. then the members of a labor union are not such persons as are within the contemplation of the said constitutional provision. Certainly, if the court issues its extraordinary writ of injunction prohibiting the defendants from displaying banners, circulars, and talking on the streets with respect to the strike, then, while the restraining order exists, the defendants restrained by the terms of such order are deprived of a constitutional right enjoyed by all other citizens of the state. Can a court of equity thus suspend the constitutional rights of a citizen because such citizen happens to be insolvent and unable financially to respond in damages for the abuse of that right? What degree of wealth is required to authorize a citizen to enjoy all of his constitutional rights without interference by the courts? The answer is

that the matter of financial worth does not limit the constitutional right to speak, write, and publish on all subjects. If this right is abused to the harm of another, the remedy given is an action for damages, and that remedy is deemed adequate. If the public suffers injury because the things written, printed, and published are maliciously false, and in their nature tend to bring any person into disrepute, contempt, or ridicule, the remedy is by a criminal action of libel. Section 221, Pen. Code of 1913.

In *Lindsay & Co.* v. *Montana Federation of Labor,* 37 Mont. 264, 127 Am. St. Rep. 722, 18 L. R. A. (N. S.) 707, 96 Pac. 127, the court, having before it the interpretation of a similar constitutional provision, used the following language:

"The guaranty of this section extends as fully to the poorest as to the wealthiest citizen of the state; and, though an abuse of the liberty so guaranteed may result in loss for which there cannot be any adequate compensation, the framers of our Constitution in preparing it, and the people in adopting it, doubtless concluded that it was better that such results be reached in isolated cases than that the liberty of speech be subject to the supervision of a censor. To declare that a court may say that an individual shall not publish a particular item is to say that the court may determine in advance just what the citizen may or may not speak . . . upon a given subject, is, in fact, to say such court is a censor of speech as well as of the press. Under similar constitutional provisions the supreme courts of California and Missouri have reached the same conclusion. *Dailey* v. *Superior Court,* 112 Cal. 94, 53 Am. St. Rep. 160, 32 L. R. A. 273, 44 Pac. 458; *Marx & Haas Jeans Clothing Co.* v. *Watson,* 168 Mo. 133, 90 Am. St. Rep. 440, 56 L. R. A. 951, 67 S. W. 391."

I think this is the sound interpretation to be given the constitutional provision *supra.* The fact that the person attacked by the wrongful speech, writing, or printing, if injured, may recover damages by a civil action he is thereby given a complete remedy, and the remedy furnished is adequate for the purposes, and equity may not be invoked because the offending person or persons are financially unable to respond in damages, or because a great number of lawsuits must be commenced.

The court was correct in its findings, and the order dismissing the action necessarily followed. I find no reversible

error in the record, and I am therefore of the opinion that the judgment should be affirmed.

FRANKLIN, C. J., and ROSS, J., concur.

On the right, in aid of strike, to employ peaceable persuasion to induce persons not under contract to quit, or not accept employment, see note in 41 L. R. A. (N. S.) 445.

On right of labor unions to notify persons not to deal with a certain individual, see notes in 16 L. R. A. (N. S.) 85; 18 L. R. A. (N. S.) 707; 32 L. R. A. (N. S.) 748.

The question of law as to picketing is discussed in notes in 4 L. R. A. (N. S.) 302; 50 L. R. A. (N. S.) 412.