[S. F. No. 4092.  In Bank.—July 6, 1909.]

## E. G. PIERCE, Respondent, v. STABLEMEN'S UNION, LOCAL No. 8760, et al., Appellants.

INJUNCTION—IRREPARABLE INJURY—ACTS INVOLVING COMMISSION OF CRIME.—While equity will not attempt to restrain the commission of a crime as such, the fact that an act threatening irreparable injury to property rights is of itself criminal does not deprive a court of equity of its right and power to enjoin its commission.

ID.—CONTINUING TRESPASS.—While equity will not enjoin against a trespass as such, yet when the acts committed and threatened are in the nature of a continuing trespass, working irreparable injury, they will be enjoined.

ID.—DISPUTES BETWEEN EMPLOYER AND EMPLOYEES—ACT OF MARCH 20, 1903.—CONSTITUTIONAL LAW—LABOR UNION—UNLAWFUL BOYCOTT. —If the act of March 20, 1903, entitled "An act to limit the meaning of the word 'conspiracy' and also the use of restraining orders and injunctions as applied to disputes between employers and employees in the state of California," should be construed as prohibiting the granting of an injunction, at the instance of an employer of labor, to restrain a labor union from maintaining an unlawful boycott working irreparable injury to his business, it would be void as violative of one's constitutional right to acquire, possess, enjoy, and protect property, as well as obnoxious to the constitution in creating arbitrarily and without reason a class above and beyond the law which is applicable to all other individuals and classes.

ID.—SPECIAL LEGISLATION—SPECIAL PRIVILEGES AND IMMUNITIES.—So construed, the act would legalize a combination in restraint of trade or commerce, entered into by a trade union, which would be illegal if entered into by any other persons or associations, and would exempt trades unions from the operation of the general laws of the land, under circumstances where the same laws would operate against all other individuals, combinations, or associations. It would thus not only be special legislation, obnoxious to the constitution (art. IV, sec. 25, subds. 3, 33), but would also violate the constitution

in attempting to grant privileges and immunities to certain citizens or classes of citizens which, upon the same terms, have not been granted to all citizens. (Art. I, sec. 21.)

ID.—BOYCOTT WHEN ENJOINED—ILLEGAL MEANS FOR ENFORCEMENT.— Whether or not a court of equity may enjoin a boycott maintained by a labor union against the plaintiff's business, depends upon the means employed by the defendants in carrying it into effect. If the means employed, or threatened to be employed, are illegal, the injunction will issue; otherwise it will not issue.

ID.—BOYCOTT WHEN LEGAL—JUSTIFIABLE ACTS OF STRIKING EMPLOYEES.—An organized union of employees, by concerted action, where no contractual obligation interferes, has the right to maintain a "strike" in furtherance of trade interests, and may engage in a legal boycott. Such a boycott implies not only the right to the concerted withdrawal of social and business intercourse, but the right by all legitimate means of fair publication, and fair oral or written persuasion, to induce others interested in or sympathetic with their cause, to withdraw their social intercourse and business patronage from the employer. It implies also the right to request of another that he withdraw his patronage from the employer, and to use the moral intimidation and coercion of threatening a like boycott against him if he refuses so to do.

ID.—ILLEGAL BOYCOTT—PICKETING NOT PERMISSIBLE—WANT OF EXPRESS WORDS OR ACTS OF INTIMIDATION.—The right of striking employees to maintain a legal boycott, as above indicated, does not give them the right to maintain a "picket" about the place of business of the person boycotted, although the pickets employed do not engage in any express words or acts of threats or intimidation. The end to be attained by picketing, however artful may be the means employed, is the injury of the boycotted business through physical molestation and physical fear caused to the employer, to those whom he may have employed or who may seek employment from him, and to the general public. A boycott, to the extent that it engages in picketing, is illegal and will be enjoined.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. John Hunt, Judge.

The facts are stated in the opinion of the court.

Maguire, Lindsay, Houx & Barrett, for Appellants.

Bush Finnell, for Respondent.

HENSHAW, J.—The plaintiff went into equity seeking an injunction to restrain the defendants from illegal interference with its business. Plaintiff conducted a livery, board, and

feed stable in the city and county of San Francisco. The officers and representatives of defendant made request of him to "unionize" his stable by discharging his non-union employees and employing union men in their places. Upon his refusal, a strike of the union men was declared. Following the strike, a boycott was decreed. A patrol about plaintiff's place of business was established, and, under the findings, these representatives of the defendants, the pickets, "called forth in loud, threatening and menacing tones to the patrons and customers of plaintiffs not to patronize plaintiffs in their said business; defendant, the Stablemen's Union, through its agents and representatives, has stated to and threatened patrons and customers and other persons dealing with plaintiffs that if said patrons and customers and other persons continued to patronize and do business with plaintiffs, said Stablemen's Union would cause them respectively to be boycotted in their business." Menacing terms and threatening language were made use of by the agents, representatives, and pickets of the union toward the employees of the plaintiff such as "Unfair stable, union men locked out and non-union men put in, look at this stable, the only unfair stable on Market Street; the stable that always was and always will be unfair. This is a scab stable. When we catch you outside, we will finish you. We will get you yet. It is a scab stable, full of scabs. We will fix you yet. It is a matter of time when we will get you all right. You will never get out of the stable alive. We will break you in half. We will beat you to death. When we catch you outside, we will finish you." A judgment for an injunction followed upon these findings, and that judgment by its terms commanded the defendant, its agents, and employees, to desist and refrain "from in any wise interfering with, or harassing, or annoying, or obstructing plaintiffs in the conduct of the business of their stable, known as the Nevada Stables, and situated at number 1350 Market Street, in the city and county of San Francisco; or from in any wise molesting, interfering with, threatening, intimidating or harassing any employee or employees of plaintiffs; or from intimidating, harassing, or interfering with any customer or customers, patron or patrons of plaintiffs in connection with the business of plaintiffs, either by boycott or by threats of boycott, or by any other threats; or

by any kind of force, violence or intimidation, or by other
unlawful means, seeking to induce any employee or employees
of plaintiffs to withdraw from the service of plaintiffs; or
by any kind of violence, threats or intimidation inducing, or
seeking to induce, any customer or customers, patron or
patrons, of plaintiffs to withdraw their patronage or business
from them, or from stationing or placing in front of said
plaintiffs' place of business any picket, or pickets, for the
purpose of injuring, obstructing or in any wise interfering
with, the business of plaintiffs, or for the purpose of prevent-
ing any customer or customers, patron or patrons, of plaintiffs
from doing business with them; or from in any other way
molesting, intimidating or coercing, or attempt to molest or
intimidate or coerce any customer, patron or employee of
plaintiffs now or hereafter dealing with, or any employee now
or hereafter employed by, or working for plaintiffs in their
said business."

This appeal is from the judgment. The findings are not
attacked. Certain objections to the complaint are presented
upon demurrer, and these may be briefly disposed of. The
complaint is sufficient to invoke the interposition of a court
of equity. It is in this respect similar to the complaint con-
sidered in *Goldberg-Bowen Co.* v. *Stablemen's Union*, 149 Cal.
429, [117 Am. St. Rep. 145, 86 Pac. 806]. The complaint
alleges specific acts calling for preventive relief, and is not
confined to mere generalities, as was the case in *Davitt* v.
*American Bakers' Union*, 124 Cal. 99, [56 Pac. 775]. The fact
that certain of the acts charged amount to crimes or threat-
ened crimes, does not offer reason why equity will refuse to
restrain them. While equity will not attempt to restrain the
commission of a crime as such, the fact that an act threaten-
ing irreparable injury to property rights is of itself criminal,
does not deprive a court of equity of its right and power to
enjoin its commission. (*In re Debs*, 158 U. S. 564, [15 Sup.
Ct. 900]; *Sherry* v. *Perkins*, 147 Mass. 212, [9 Am. St. Rep.
689, 17 N. E. 307]; *Vegelahn* v. *Gunther*, 167 Mass. 92, [57
Am. St. Rep. 443, 44 N. E. 1077].) In like manner, while
equity will not enjoin against a trespass as such, yet when
the acts committed and threatened are in the nature of a con-
tinuing trespass, working irreparable injury, they will be
enjoined. (*Boston etc. R. R. Co.* v. *Sullivan*, 177 Mass. 230,

[83 Am. St. Rep. 275, 58 N. E. 689]; *Lembeck* v. *Nye,* 47 Ohio, 336, [21 Am. St. Rep. 828, 24 N. E. 686].)

Appellants' principal contentions upon the appeal, however, are the following: 1. That, as the controversy between these parties arises from and over a trade dispute, the court is powerless to grant any injunction under the language of "An act to limit the meaning of the word 'conspiracy' and also the use of restraining orders and injunctions as applied to disputes between employers and employees in the state of California, approved March 20, 1903" [Stats. 1903, p. 289] (Pen. Code, (Deering Ed. 1909,) p. 762) ; 2. That the boycott is a legal weapon in a trade dispute and, therefore, an injunction should not issue to restrain its use or threatened use; and 3. That "picketing" as an adjunct to the boycott is itself legal and may not be forbidden.

1. As to the first of these contentions, this court had occasion in *Goldberg etc. Co.* v. *Stablemen's Union,* 149 Cal. 429, [117 Am. St. Rep. 145, 86 Pac. 806], to consider the statute above referred to and relied upon by appellants, and declared that if the construction there contended for (and here contended for) was the proper construction, this provision of the act was void. Not only would it be void as violative of one's constitutional right to acquire, possess, enjoy, and protect property, but as well would it be obnoxious to the constitution in creating arbitrarily and without reason a class above and beyond a law which is applicable to all other individuals and classes. It would legalize a combination in restraint of trade or commerce, entered into by a trades union, which would be illegal if entered into by any other persons or associations. It would exempt trades unions from the operation of the general laws of the land, under circumstances where the same laws would operate against all other individuals, combinations, or associations. It is thus not only special legislation, obnoxious to the constitution (art. IV, sec. 25, subds. 3, 33), but it still further violates the constitution in attempting to grant privileges and immunities to certain citizens or classes of citizens which, upon the same terms, have not been granted to all citizens. (Art. I, sec. 21.)

2. In considering the second proposition, whether or not a court of equity may enjoin a boycott, the meaning of the word is of primary importance. It is defined in 4 Am. & Eng.

Ency. of Law, 2d ed., p. 85, as follows: "The boycott is a conspiracy, the direct object of which is to occasion loss to the party or parties against whom the conspiracy is directed, and the means commonly used is the inducing of others to withdraw from such party or parties their patronage and business intercourse by threats, that unless they so withdraw, the members of the combination will cause, directly or indirectly, loss of a similar character to them." Appellants announce their willingness to accept this definition, substituting the word "confederacy" or "combination" for "conspiracy." But the definition, even as so amended, it will be noted is not complete. The "means commonly used" are specified, but other means may be and frequently are employed. A boycott may adopt illegal means and thus become a "conspiracy," a word which imports illegality; or a boycott may employ legal means and methods, and thus be merely a legitimate combination by a number of men to accomplish, within the law, a legal result. The crux of the question and the strain in every case lie, then, in the means employed. We think that today no court would question the right of an organized union of employees, by concerted action, to cease their employment (no contractual obligation standing in the way), and this action constitutes a "strike." We think, moreover, that no court questions the right of those same men to cease dealing by concerted action, either socially or by way of business, with their former employer, and this latter act, in its essence, constitutes the primary boycott. But what acts organized labor may do, and what means it may adopt to accomplish its end, without violation of the law, have presented questions of much nicety, over which the courts have stood, and still stand, widely divided. It would not be profitable to discuss and analyze these widely divergent cases. It is sufficient to formulate briefly the principles adopted in this state, many of which have recently found elaborate expression in the case of *Parkinson* v. *Building Trades Council of Santa Clara*, 154 Cal. 581, [98 Pac. 1027]. The right of united labor to strike, in furtherance of trade interests (no contractual obligation standing in the way) is fully recognized. The reason for the strike may be based upon the refusal to comply with the employees' demand for the betterment of wages, conditions, hours of labor, in the discharge of one employee, or the en-

gagement of another—in brief, in any one or more of the multifarious considerations which in good faith may be believed to tend toward the advancement of the employees. After striking, the employees may engage in a boycott, as that word is here employed. As here employed it means not only the right to the concerted withdrawal of social and business intercourse, but the right by all legitimate means—of fair publication, and fair oral or written persuasion, to induce others interested in or sympathetic with their cause, to withdraw their social intercourse and business patronage from the employer. They may go even further than this, and request of another that he withdraw his patronage from the employer, and may use the *moral* intimidation and coercion of threatening a like boycott against him if he refuse so to do. This last proposition necessarily involves the bringing into a labor dispute between A and B, C, who has no difference with either. It contemplates that C, upon the request of B, and under the moral intimidation lest B boycott him, may thus be constrained to withdraw his patronage from A, with whom he has no controversy. This is the "secondary boycott;" the legality of which is vigorously denied by the English courts, the federal courts, and by the courts of many of the states of this nation. Without presenting the authorities, which are multitudinous, suffice it to state the other view in language of the President of the United States but recently uttered: "A body of workmen are dissatisfied with the terms of their employment. They seek to compel their employer to come to their terms by striking. They may legally do so. The loss and inconvenience he suffers he cannot complain of. But when they seek to compel third persons, who have no quarrel with their employer, to withdraw from all association with him by threats that unless such third persons do so the workmen will inflict similar injury on such third persons, the combination is oppressive, involves duress, and if injury results, it is actionable." (President Taft, *McClure's Magazine*, June, 1909, p. 204.) Notwithstanding the great dignity which attaches to an utterance such as this, which, as has been said, is but the expression of numerous courts upon the subject-matter, this court, after great deliberation, took what it believed to be the truer and more advanced ground above indicated and fully set forth in *Parkinson* v. *Building Trades Council etc.*, 154 Cal. 581, [98

Pac. 1027]. In this respect this court recognizes no substantial distinction between the so-called primary and secondary boycott. Each rests upon the right of the union to withdraw its patronage from its employer and to induce by fair means any and all other persons to do the same, and in exercise of those means, as the unions would have the unquestioned right to withhold their patronage from a third person who continued to deal with their employer, so they have the unquestioned right to notify such third person that they will withdraw their patronage if he continues so to deal. However opposed to the weight of federal authority the views of this court are, that they are not unique may be noted by reading *National Protective Association* v. *Cumming*, 170 N. Y. 315, [88 Am. St. Rep. 648, 63 N. E. 369]; *Lindsay* v. *Montana Federation of Labor*, 37 Mont. 264, [127 Am. St. Rep. 422, 96 Pac. 127, 18 L. R. A. (N. S.) 707], where the highest courts of those states formulate and adopt like principles.

It has been said that it is important to any correct understanding of or adjudication upon such questions that a definition of the word "boycott" should be first stated. Thus, to say that a boycott is a "conspiracy" immediately implies illegality, and puts the conduct of the boycotters under the ban of the law. So, also, does the definition which describes boycotting as "illegal coercion" designed to accomplish a certain end. As we have undertaken to define boycott, it is an organized effort to persuade or coerce, which may be legal or illegal, according to the means employed. In other jurisdictions where a definition is given to a boycott which imports illegality the injunction will of course lie against boycotting as such. In this state the injunction will issue, depending upon the circumstances whether the means employed, or threatened to be employed, are legal or illegal.

3. We are thus brought to consider the method of "picketing," the use of which appellants contend is a legal weapon in their hands. So far in this discussion we have dealt exclusively with the respective rights of the employer and of the employee. There are other parties, however, whose rights are entitled to equal consideration, and whose rights always become involved and imperiled when picketing is adopted as a coercive measure in aid of a boycott.

If the strikers have the right, as above indicated, to withdraw patronage themselves and by fair publication, written and oral persuasion to induce others to join in their cause, and finally, by threat of like boycott, to coerce others into so doing, their rights go no further than this. It is the equal right of the employer to insist before the law that his business shall be subject at the hands of the strikers to no other detriment than that which follows as a consequence of the legal acts of the strikers so above set forth. It is not to be forgotten that when the employees have struck, they occupy no contractual relationship whatsoever to their former employer, and have no right to coerce him or attempt to coerce him by the employment of any other means than those which are equally open to any other individual or association of individuals. No sanctity attaches to a trades union which puts it above the law, or which confers upon it rights not enjoyed by any other individual or association. The two classes of persons to whom we have adverted and whose rights necessarily become involved where a picket or patrol is established, are: 1. The rights of those employed or seeking employment in the place of the striking laborers; and 2. The rights of the general public. It is the absolute, unqualified right of every employee, as well as of every other person, to go about his legal business unmolested and unobstructed and free from intimidation, force, or duress. The right of a labor association to strike is no higher than the right of a non-union workman to take employment in place of the strikers. Under the assurance and shield of the constitution and of the laws, the non-union laborer may go to and from his labor and remain at his place of labor in absolute security from unlawful molestations, and wherever such protection is not fully accorded, not the laws themselves, but their execution is to be blamed. In this country a man's constitutional liberty means far more than his mere personal freedom. It means that, among other rights, his is the right freely to labor and to own the fruits of his toil. (*Ex parte Jentzsch,* 112 Cal. 468, [4 Pac. 803].) Any act of boycotting, therefore, which tends to impair this constitutional right freely to labor, by means passing beyond moral suasion, and playing by intimidation upon the physical fears, is unlawful.

The inconvenience which the public may suffer by reason of a boycott lawfully conducted is in no sense a legal injury. But the public's rights are invaded the moment the means employed are such as are calculated to and naturally do incite to crowds, riots, and disturbances of the peace. And as illegally interfering with his business, the employer may justly complain when the rights of his non-union employee and the rights of the public are thus invaded.

A picket, in its very nature, tends to accomplish, and is designed to accomplish, these very things. It tends and is designed by physical intimidation, to deter other men from seeking employment in the places vacated by the strikers. It tends and is designed to drive business away from the boycotted place, not by the legitimate methods of persuasion, but by the illegitimate means of physical intimidation and fear. Crowds naturally collect, disturbances of the peace are always imminent and of frequent occurrence. Many peaceful citizens, men and women, are always deterred by physical trepidation from entering places of business so under a boycott patrol. It is idle to split hairs upon so plain a proposition, and to say that the picket may consist of nothing more than a single individual peacefully endeavoring by persuasion to prevent customers from entering the boycotted place. The plain facts are always at variance with such refinements of reason. Says Chief Justice Shaw in *Commonwealth* v. *Hunt*, 4 Metc. 111, [38 Am. Dec. 346]: "The law is not to be hoodwinked by colorable pretenses; it looks at truth and reality through whatever disguise it may assume." If it be said that neither threats nor intimidations are used, no man can fail to see that there may be threats, and there may be intimidations, and there may be molesting and there may be obstructing, without there being any express words used by which a man should show violent threats toward another, or any express intimidation. We think it plain that the very end to be attained by picketing, however artful may be the means to accomplish that end, is the injury of the boycotted business through physical molestation and physical fear caused to the employer, to those whom he may have employed or who may seek employment from him, and to the general public. The boycott having employed these means for this unquestioned purpose, is illegal, and a court will not seek by over-niceties

and refinements to legalize the use of this unquestionably illegal instrument. (*Vegelahn* v. *Guntner,* 167 Mass. 92, [57 Am. St. Rep. 443]; *Crump* v. *Commonwealth,* 84 Va. 927, [10 Am. St. Rep. 895, 6 S. E. 620]; *Union Pacific* v. *Ruef,* 120 Fed. 124; 18 Ency. of Law, 2d ed., p. 85.)

In conclusion, then, and applying these principles to the injunction here under consideration, it appears that, while the injunction was properly granted, it was broader in its terms than the law warrants. It was, for example, too broad in restraining defendants from "in any wise interfering with" plaintiff's business, since the interference which we have discussed, of publication, reasonable persuasion, and threat to withdraw patronage, is legal and such as defendants could employ. So, also, was the injunction too broad in restraining defendants from "intimidating any customer by boycott or threat of boycott" since, as has been said, the secondary boycott is likewise a legal weapon. In all other respects, however, the injunction was proper.

The trial court is directed to modify its injunction in the particulars here specified, and in all other respects the judgment will stand affirmed.

Lorigan, J., Melvin, J., and Beatty, C. J., concurred.

ANGELLOTTI, J., and SLOSS, J., concurring.—We concur in the judgment. The modification of the judgment is in line with the views announced in the Parkinson case. So far as "picketing" is concerned, while we are not prepared to hold that there may not be acts coming within that term as it is accepted and understood in labor disputes, that are entirely lawful and should not be enjoined, we believe that as to such "picketing" as is described in both findings and judgment in this case the views expressed in the opinion of the court are correct.

SHAW, J., concurring.—I agree with all that is said by Justice Henshaw in his opinion, except the part relating to the so-called "secondary boycott" and the attempt to draw a distinction between the compulsion of third persons caused by picketing, and the compulsion of third persons produced by a boycott. My views concerning the "secondary boycott" are

expressed in my dissenting opinion in *Parkinson* v. *Building Trades Council,* 154 Cal. 581, [98 Pac. 1027, 98 Pac. 1040]. The means employed for the coercion or intimidation of a third person in a "secondary boycott" are unlawful whenever they are such as are calculated to, and actually do, destroy his free will and cause him to act contrary to his own volition in his own business, to the detriment of the person toward whom the main boycott or strike is directed; in other words, whenever the means used constitute duress, menace, or undue influence. Whether this coercion or compulsion comes from fear of physical violence, as in the case of picketing, or from fear of financial loss, as in the "secondary boycott," or from fear of any other infliction, is, in my opinion, immaterial, so long as the fear is sufficiently potent to control the action of those upon whom it is cast. I can see no logical or just reason for the distinction thus sought to be made. There is no such distinction in cases where contracts or wills are declared void, because procured by duress, menace, or undue influence. There should be none where actual injury is produced or threatened through such means acting upon third persons. Nor do I believe any well-considered case authorizes any such distinction. The opinions in the case of *National Protective Association* v. *Cumming,* 170 N. Y. 315, [88 Am. St. Rep. 671, 63 N. E. 369], are devoted to a discussion of the right to strike and the limitations of that right and not to a discussion of the "secondary boycott." A close analysis of the cases on the subject will, as I believe, show that this court stands alone on this point.

For these reasons I do not agree to that part of the judgment directing a modification of the injunction. I believe that it should stand in the form as given by the court below.