[Crim. No. 3317.  Second Appellate District, Division One.—April 3, 1940.]

In the Matter of the Application of CARL D. FORTEN-BURY for a Writ of Habeas Corpus.

Gallagher, Wirin & Johnson for Petitioner.

Buron Fitts, District Attorney, and Jere J. Sullivan, Deputy District Attorney, for Respondent.

DORAN, J.—Duly cited with contempt of court for the violation of a temporary restraining order, the petitioner herein, after a hearing on such citation, was adjudged guilty and fined five dollars with the alternative of one day in the county jail for each two dollars of said fine remaining unpaid.

Petitioner seeks a writ of *habeas corpus.*

The temporary restraining order and order to show cause were based upon a verified complaint in an action wherein Edward Chiate and Hazel I. Chiate, doing business under the fictitious name and style of Sunset Poultry Market, were plaintiffs, and the United Cannery Agricultural Packing and Allied Workers of America, C. I. O., an unincorporated association, Valley Poultry Workers Union, Local No. 17, an unincorporated association, and others, were defendants.

A memorandum opinion was filed by the trial judge in connection with the disposition of the contempt proceedings; excerpts therefrom which follow contain the pertinent facts revealed by the record: "This action was brought to enjoin picketing of plaintiffs' markets by members of the defendant unions. After an informal conference in chambers with counsel for plaintiffs and defendants, at which it was conceded that no labor dispute existed between plaintiffs and their employees, a temporary restraining order was issued prohibiting picketing. Subsequently defendants moved to vacate the restraining order for reasons hereinafter appearing.

"Plaintiffs are engaged in the business of selling poultry and eggs at retail and wholesale, at two places of business in the City of Los Angeles. None of plaintiffs' employees are members of any of the defendant unions and there is not and never has been any labor dispute between plaintiffs and their employees. Plaintiffs purchase poultry and eggs for resale purposes throughout California, Utah, Colorado, and Oregon, a portion thereof being produced by the Runnymede Farms, located at Reseda, California. The Runnymede products are not separated from poultry and eggs purchased from others, but are commingled with various producers, and the commingled produce is sold to plaintiffs' customers.

"For some time past the employees of the Runnymede Farms, who are members of one or more of the defendant unions, have been involved in a labor dispute with their employer and have been on strike. The defendant unions

demanded that the plaintiffs cease purchasing merchandise from the Runnymede Farms because of the labor dispute there existing. Upon the refusal of plaintiffs to accede to that demand the defendants stationed picket lines in front of plaintiffs' markets.

. . . . . . . . . . . . . .

"In the instant case, while plaintiffs have had no dealings with the defendant unions, they cannot be classed as strictly neutral for the reason that they are purchasing and selling merchandise produced by the persons with whom the unions are in dispute. If Runnymede Farms is paying less than the union scale of wages or is requiring its employees to work longer than union hours, the plaintiffs, by purchasing Runnymede products, may have an advantage over other dealers in that they may be able to sell at a lower price than their business rivals, or may sell at the same price and make a greater profit than others. To this extent, at least, there is a unity of interest between Runnymede Farms and the plaintiffs, and the plaintiffs are in a more favorable position than those who are dealing in union merchandise. The strategy of the unions is to prevent the sale of nonunion merchandise. The Runnymede poultry and eggs come in contact with the public at retail stores, not at the farm. If the defendants cannot follow the product and, by means of picketing the same wherever it may be sold at retail, request the purchasing public to refrain from buying it, they will be unable to make known their grievances to the public in the only manner available to them. Such a request, lawfully and peacefully made by picketing the product at the place at which the request will reach the purchaser, if pointed solely at and limited to the product and not aimed at the plaintiffs, will be a primary boycott against the merchandise and against the producer, the Runnymede Farms. Punishment will not thereby be visited upon third persons, the plaintiffs, who are without interest in the existing dispute. But picketing directed in any manner at the plaintiffs personally, at their markets as such, or at the collective produce sold generally by them, will constitute an illegal act and will be enjoined for the reasons hereinbefore stated.

"Other questions than those herein discussed might be presented if the Runnymede Farms were the sole source of supply of the poultry and eggs sold by plaintiffs. Such

questions cannot arise in this case because plaintiffs may obtain ample quantities from hundreds of producers and, in fact, according to their own allegations, they have been and are procuring merchandise from several states.

"After the service of the temporary restraining order two affidavits were filed charging four pickets with contempt of court in that they continued picketing after service of the order. One affidavit charged them with having picketed during the remainder of the day after service, the other charged violation of the order on two subsequent days. The latter affidavit was not served with the citation and the court will therefore consider only the charge contained in the one affidavit. The persons cited admit that they continued picketing during the remainder of the day after they were served, but their counsel argued that they should be excused because they had not received legal advice as to their duties. The temporary restraining order was plainly titled and was couched in unambiguous language. The deputy sheriff who served the order states in an affidavit that he read and explained the order to the pickets and they admit that he did so. It was their duty to cease their activities immediately upon service of the order without awaiting legal advice."

In addition to the foregoing it should be noted that the complaint in the action, among other things, alleged in substance that defendants and each of them combined and confederated, conspired and agreed among themselves and with each other to compel the plaintiffs to refrain from fulfilling their obligations with Runnymede Farms, namely, in accepting poultry and eggs therefrom; that in furtherance thereof defendants declared a boycott against plaintiffs and maintained a picket line in front of plaintiffs' place of business; that in furtherance of said plan and in an endeavor to effect the objects and purposes thereof and with such common intention and design, the defendants and each of them did and caused to be done certain acts, briefly, as follows:

1. That defendants maintained a large number of pickets at, upon and near the premises of plaintiffs and upon the public highway near and adjacent to said premises, and by intimidation and threats endeavored to stop customers and patrons of plaintiffs from entering said place of business;

2. That defendants followed, harassed, spied upon and intimidated the customers and patrons of plaintiffs in an at-

tempt to prevent said customers and patrons from purchasing from said plaintiffs;

3. That said pickets and representatives so stationed near and about the place of business of plaintiffs, wearing badges with inscriptions thereon, "C. I. O.", walked back and forth upon the sidewalks and premises of plaintiffs' place of business;

4. That said defendants followed a truckload of merchandise of plaintiffs to be delivered to plaintiffs' customer and upon its arrival informed plaintiffs' customer that said merchandise was "hot cargo"; that when customers were about to enter the place of business of plaintiffs said customers were approached and told not to purchase merchandise from plaintiffs for the reason that said market was unfair to organized labor;

5. That defendants followed a truckload of merchandise to be delivered to plaintiffs' customer, namely, the Thrifty Drug Stores, and upon the arrival of said merchandise defendants entered the Thrifty Drug Store, displayed and distributed pamphlets and leaflets which in substance urged the readers thereof not to patronize the Thrifty Drug Stores, whereupon the management of said stores refused to take merchandise from plaintiffs and their representatives; that several persons called the plaintiff, Edward Chiate, by telephone and after refusing to give their names stated that if he (referring to plaintiff) did not refrain from buying chickens from Runnymede they "would get him and his family".

The restraining order in part was as follows: "Upon the reading and filing of the verified complaint in the above entitled matter, it appearing to the satisfaction of the court that this is a proper case for a temporary restraining order, and that plaintiffs and their counsel desire in good faith to present to the court a *bona fide* contention respecting the rights of said plaintiffs as contended for in said complaint, and that unless the temporary restraining order prayed for in said complaint is granted, the effect of the decision of the court upon the order to show cause, if favorable to plaintiffs, would be largely frustrated, and great and irreparable injury and damage would ensue to the plaintiffs before the matter could be heard on notice. . . . " Wherefore it was ordered in substance that defendants and each of them should appear before the court on November 13th and show

cause why they should not be enjoined pending the final determination of the action, and, pending the hearing of the order to show cause were enjoined, from doing certain things and engaging in certain activities, which injunctions approximated the allegations of the complaint. Subdivision "(i)" thereof was as follows: "From stationing, placing or maintaining any picket, or pickets, or person or persons, in front of or in the immediate vicinity of the said markets of the plaintiffs". It is argued by petitioner that by reason of this last-mentioned injunction the restraining order was void.

It is contended in substance by petitioner that the restraining order and judgment violate the constitutional guaranties of freedom of speech and freedom of the press. It is also contended that either a primary or a secondary boycott is legal. Petitioner's closing brief sums up and sets forth these contentions as follows: "The central issue in the instant Petition for Writ of Habeas Corpus is: 'Is peaceful secondary picketing legal?' ", and, "Whether an order enjoining all peaceful picketing abridges constitutional right, and Whether *habeas corpus* is an appropriate remedy procedurally."

A liberal portion of petitioner's briefs is devoted to the subject of *habeas corpus*. It may be conceded that the question as to whether resort to the writ of *habeas corpus* is the appropriate remedy, is always addressed to the sound discretion of the court. In that regard it may be conceded, also, for reasons which abound in the numerous decisions on the subject, that courts uniformly have been liberal in the granting of the writ and as well in a consideration of petitions therefor. It is necessary to observe, however, in that connection that such liberality has not been without valid limitation. Thus, it is well settled that the writ of *habeas corpus* does not afford an all-inclusive remedy available at all times as a matter of right. It is generally regarded as a special proceeding. ██ "Where one restrained pursuant to legal proceedings seeks release upon *habeas corpus*, the function of the writ is merely to determine the legality of the detention by an inquiry into the question of jurisdiction and the validity of the process upon its face, and whether anything has transpired since the process was issued to render it invalid." (13 Cal. Jur., p. 217.) Chapter I of part II, title XII, of the Penal Code, contains the statutory law with

regard to the writ of *habeas corpus,* and determines the power of the court to discharge under the writ.

■ From a review of the record it is at once evident that the trial court had jurisdiction of the subject-matter and of the person of the petitioner, and that the proceedings were legal in every respect. Neither the original restraining order, which was not void *ab initio,* nor the commitment of petitioner following the hearing of the contempt proceedings violated any constitutional rights of petitioner. The orders and as well the judgment of the trial court finding petitioner guilty of contempt were the orderly processes of legally constituted authority. The action of the trial court being valid, it may be enforced by lawful and appropriate means.

The record reveals that the original restraining order was issued on the 3d day of November, 1939; that the order directed the petitioner and others to appear before the court on the 13th day of November, 1939, and show cause why they should not be enjoined and restrained from doing the acts specified in said restraining order. It should be emphasized that the contempt was based on the original order and resulted from acts committed between the 3d day of November and the 13th day of November. In other words, the petitioner elected to ignore the temporary restraining order issued by the court, decided for himself that the order was invalid, and violated the same. It was petitioner's plain duty to obey the order. Petitioner now seeks to obtain—by means of a writ of *habeas corpus*—a determination of questions which properly would have been adjudicated at the hearing of the order to show cause on November 13th. In the circumstances, the law affords no such expedience at the expense of respect and due regard for its orderly processes.

■ Incidentally, the outcome of the hearing on the order to show cause, whether favorable to the plaintiffs or to the defendants, would not affect the validity of the contempt proceedings, or the judgment in connection therewith. (See *In re Charles Valterza,* 37 Cal. App. (2d) 682 [100 Pac. (2d) 337].)

Summing up the contentions of the parties to the action, each relies on that article of the Constitution which provides as follows: "All men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, pos-

sessing, and protecting property; and pursuing and obtaining safety and happiness.'' (Art. I, sec. 1, Cal. Const.)

The defendants, and petitioner herein, also rely upon the provisions of sections 9 and 13 of article I of the Constitution of California, and as well upon the Fourteenth Amendment to the Constitution of the United States.

Thus a legitimate dispute exists between the parties to the action with regard to the claims of each under the Constitution. The judicial branch of the government was created for the purpose of settling such disputes. Plaintiffs sought a determination of the questions involved, in the court: the governmental agency established to meet such needs. The right to appeal for relief to the judicial branch of the government, together with the power in the judicial branch of the government to hear, consider and adjudicate, according to the orderly procedure of the law, any and all issues raised by such appeal for relief, are products of the Constitution. Such resort to the remedy provided for by law, although a right, was no less a duty. It was likewise defendants' plain duty to abide the outcome. Each is bound to yield to legally constituted authority. To hold otherwise would in effect accord to each the privilege to settle such disputes by any manner or means each might choose to adopt.

Having elected to ignore the orderly processes of the law, petitioner has no alternative but to accept the consequences.

Finally, it should be noted that nowhere in the record or in the petition for the writ of *habeas corpus* does it appear that the petitioner is a citizen of the United States. It is suggested in *Hague* v. *Committee for Industrial Organization et al.*, 307 U. S. 496 [59 Sup. Ct. 954, 83 L. Ed. 1423], that the constitutional guaranties there considered are possessed by citizens of the United States but do not extend to aliens. Inasmuch as the subject is not mentioned by either respondent or petitioner, it has received no consideration in the opinion.

For the foregoing reasons the writ is discharged and the petitioner remanded.

York, P. J., concurred.

WHITE, J., Dissenting.—I dissent. I fail to perceive the materiality in this proceeding of the fulsome allegations

copied from the complaint and set forth in the main opinion. It is obvious that the superior court possessed jurisdiction to restrain picketing by coercive, violent and illegal means. However, we are not here concerned with those phases of the complaint, but are confronted with the question of whether the court was possessed of jurisdiction to issue that part of the temporary restraining order which forms the foundation of the citation for contempt and the violation of which forms the basis of the judgment and commitment here under attack. It is the validity of the judgment pronounced and not the allegations of the complaint, which demands our attention. In that connection, I am unable to agree with the statement of my associates as contained in the main opinion that ''from a review of the record it is at once evident that the trial court had jurisdiction of the subject matter and of the person of the petitioner, and that the proceedings were legal in every respect'', because, as I shall endeavor to point out, the order as made by the superior court was void upon its face. Conceding the correctness of the rule announced in the main opinion that when the court has jurisdiction of both the subject-matter and the parties no order made therein, however erroneous, may be defied by a party affected thereby, but that relief therefrom must be sought by appeal or a writ of *certiorari*, nevertheless, it has never been seriously contended that where lack of jurisdiction to make the order appears upon the face of the latter, disobedience thereof constitutes contempt. This last-named principle is clearly and concisely enunciated by the Supreme Court of Illinois in *Clark* v. *Burke*, 163 Ill. 334 [45 N. E. 235, 236], quoted with approval in *In re Valterza*, 37 Cal. App. (2d) 682 [100 Pac. (2d) 337], wherein it is said: ''It is well settled that, in a proceeding for contempt in failing to obey an order of the court, the respondent may question the order which he is charged with refusing to obey only in so far as he can show it to be absolutely void.''

Let us now examine the record in the instant case and therefrom advise ourselves with exactness as to the order for the violation of which petitioner was adjudged in contempt. I quote from the ''judgment of contempt and commitment'' issued by the superior court and pursuant to which petitioner is held in custody. It reads: ''That on the 3rd day of November, 1939, the court issued a restraining order returnable

on the 13th day of November, 1939, restraining and enjoining the United Cannery Agricultural Packing and Allied Workers of America, Congress of Industrial Organizations, Valley Poultry Workers, Local No. 17, an unincorporated association, and others from, amongst other things, '*stationing, placing or maintaining any picket, or pickets, or person or persons, in front of or in the immediate vicinity of the said markets of the plaintiffs'.*'' The order just quoted squarely presents the question of liberty of speech and of the press. While so far as petitioner is concerned the penalty involved may be of minor consequence, nevertheless the principle here present is of extreme importance to a people bent upon preserving their government as a democracy. That the court is without jurisdiction to issue a restraining order prohibiting every form of picketing is firmly established by decisions in this state and of the Supreme Court of the United States, because such an order abridges constitutional rights. It is my firm belief that jurisdiction never existed in any court to make an order, or to punish as a contempt the violation of an order, which contravenes constitutional guaranties or inalienable rights of the individual.

It is the law of this state, established and reestablished in numerous decisions, that in the absence of contractual obligations a union, besides having the right to declare a strike, possesses also the legal right to carry on in connection therewith a boycott, both primary and secondary. (*Lisse* v. *Local Union No. 31,* 2 Cal. (2d) 312 [41 Pac. (2d) 314]; *Pierce* v. *Stablemen's Union,* 156 Cal. 70 [103 Pac. 324]; *Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581 [98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550]; *In re Lyons,* 27 Cal. App. (2d) 293 [81 Pac. (2d) 190], and many others too numerous to cite.) In California this right to peacefully picket (and it is conceded in the case at bar that the picketing was peaceful) is grounded upon the constitutional guaranty of the right of free speech and the freedom of the press. The court lacked jurisdiction to make the order here in question because the same was an attempted infringement upon the rights guaranteed to every citizen by section 9, article I, of the Constitution of this state. The pertinent portion of the constitutional section provides: ''Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall

be passed to restrain or abridge the liberty of speech or of the press." The mandate contained in this section is clear and unequivocal, and its meaning so plain that construction is not required. It does not admit of judicial encroachment any more than it permits legislative impairment. Recent decisions of the Supreme Court of the United States and of the highest judicial tribunals of the several states all definitely determine and settle the fact that the right of freedom of speech and of the press which is protected from abridgement both by the federal and state Constitutions is among the fundamental rights and liberties guaranteed to our citizens. The rule in that regard is thus stated in 11 American Jurisprudence, pages 1108, 1109, and 1117:

"The Constitution of the United States and the Bill of Rights of many of the states contain prohibitions against the enactment of laws which would abridge the freedom of speech or of the press. . . . By virtue of later decisions of the Supreme Court, the rule has become firmly settled that the right of freedom of speech and of the press, which is protected by the First Amendment from abridgement by Congress, is among the fundamental rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the states. . . .

"Not only is the freedom of speech and of the press protected from infringement by the legislative department, *but it is also safeguarded from judicial abridgement.* An essential element of the liberty of the press is its freedom from all censorship over what shall be published and exemption from control, in advance, as to what shall appear in print. Consequently, it has been asserted that the right of freedom of speech and the press cannot coexist with the idea of preventing such freedom of speech or of the press by injunction. Thus, the right to boycott has been asserted under the constitutional guaranty of freedom of speech and of the press, and an instance is given where the authority to enjoin persons from exercising freedom of speech peaceably in assistance of a boycott has been vigorously denied . . . ''

Respondent in the case before us argues that constitutional guaranties extend to the enjoyment of property as well as the right to freely speak and write one's views. That is true, as it is also true that courts have always been zealous in guarding the rights of the people to acquire, possess and enjoy prop-

erty. (Sec. 1, art. I, Cal. Const.) The two principles enunciated in constitutional safeguards, that is, the right of freedom of expression and of the press, and the right to own and enjoy one's property, are each entitled to be maintained. There are, however, times when these principles may appear to conflict one with the other. In such cases it seems to me it becomes the duty of the courts to so construe such conflict that by such construction, even though one may seemingly yield in part to the other, that such deference will result in the preservation of both. I make bold to assert that the ownership and enjoyment of property cannot exist if liberty of speech and of the press, as well as the right of peaceable assemblage, is throttled. The history of tyrants, despots and dictators through the ages and even in our own time is replete with overwhelming proof that preceding the confiscation of property these ruthless characters have first outlawed freedom of speech and the press, as well as the right of assemblage. The reason therefor is obvious. Take away the rights just mentioned and you have destroyed the last vestige of defense by the citizen against spoliation of property and the rights incidental to ownership thereof. Rob a people of the liberties of speech and of the press and of assemblage, and you have stripped them of the only weapons available to them with which to protect and preserve their property or to prevent the destruction of their rights therein.

In the case at bar there is no claim that the order sought to prevent picketing by the use of force, coercion or violence. In fact, it is conceded that the picketing was peaceful and that petitioner was merely displaying a placard upon which was inscribed or printed his claim that the Sunset Market was ''unfair'' to his local union. In the claim that the order here under review did not foreclose ''peaceful picketing'' respondent cannot be sustained. That is precisely what the *ex parte* temporary restraining order, for the violation of which petitioner was found guilty of contempt, sought to do, and which, it is my contention, the court had no right to do. The right of peaceful picketing—that is, publicizing the fact that a place of business is ''unfair'' to organized labor—is the offspring of the constitutional guaranty of freedom of speech and of the press. The injunctive power of a court does not extend so far as to authorize an infringement of these constitutional rights, and that is exactly what was done in the

instant case when the court enjoined petitioner from his right to speak or publish his views.

Petitioner does not deny the right of Sunset Market to sell the products of Runnymede Farms, with which last-named concern his union is having labor difficulties; but he does claim that under his constitutional privilege of freedom of speech and freedom to publish his views, he had a right to advise the public that in selling Runnymede products Sunset Market was doing that which was regarded as "unfair" to him and his associate members of Local Union No. 17. The court was therefore without jurisdiction to issue the order or to punish for a violation thereof. Upon its face the order is void because it contravenes a constitutional right of the petitioner. Where abridgement of constitutional rights commences, there jurisdiction ends. The state, it is true, may protect itself against the *abuses* of constitutional rights, such as using speech, press, or assembly to foment riots, violence, or crime, but the *rights* thereunder are immune from curtailment. It is the abuse, and not the right, which the state may control. (*De Jonge* v. *Oregon,* 299 U. S. 353 [57 Sup. Ct. 255, 81 L. Ed. 278].) As was said by Justice Brandeis in *Whitney* v. *California,* 274 U. S. 357 [47 Sup. Ct. 641, 71 L. Ed. 1095], and reaffirmed by the United States Supreme Court in *Herndon* v. *Lowry,* 301 U. S. 242 [57 Sup. Ct. 732, 81 L. Ed. 1337], "The right of free speech, the right to teach, and the right of assembly, are, of course, fundamental rights. . . . These may not be denied or abridged. But, although the rights of free speech and assembly are fundamental, they are not in their nature absolute. Their exercise is subject to restriction, if the particular restriction proposed is required in order to protect the state from destruction or from serious injury—political, economic or moral."

In the case of *Kim Young* v. *People of the State of California* and two similar cases decided in connection therewith by the United States Supreme Court (308 U. S. 147 [60 Sup. Ct. 146, 84 L. Ed 155]), where the court had before it the question of the power of municipalities to make regulations in the interests of public safety, health, welfare or convenience, in connection with which the municipalities there involved passed ordinances restricting the distribution of pamphlets and leaflets, the Supreme Court says: "So long as legislation to this end does not abridge the constitutional

liberty of one rightfully upon the street to impart information through speech or the distribution of literature, it may lawfully regulate the conduct of those using the streets.'' The court then proceeds to point out that the abuse of this lawful right, such as where a group of distributors formed a cordon across the street so as to interfere with pedestrians who were passing and who did not accept a tendered leaflet, may be made the subject of legislation and be restricted by the municipality. In the case at bar there is no claim that petitioner interfered with traffic or intercepted pedestrians or did anything other than publish his views of and concerning the relations existing between his local union and the Sunset Market. With reference to these fundamental rights, the Supreme Court in the last-cited case says:

''This court has characterized the freedom of speech and that of the press as fundamental personal rights and liberties. The phrase is not an empty one and was not lightly used. It reflects the belief of the framers of the Constitution that exercise of the rights lies at the foundation of free government by free men. It stresses, as do many opinions of this court, the importance of preventing the restriction of enjoyment of these liberties. In every case, therefore, where legislative abridgement of the rights is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions.''

Further in the same case the court says, with reference to its opinion in *Lovell* v. *City of Griffin,* 303 U. S. 444 [82 L. Ed. 949, 58 Sup. Ct. 666], that it had there held that ''whatever the motive, the ordinance was bad because it imposed penalties for the distribution of pamphlets, which had become historical weapons in the defense of liberty, by subjecting such distribution to license and censorship; and that *the ordinance was void on its face,* because it abridged the freedom of the press''.

If ''the ordinance was *void upon its face''* for the reasons stated by the Supreme Court, then I contend the order here under review was ''void upon its face'', because if the legislative branch of the government cannot impinge upon the con-

stitutional guaranties nor abridge the right of freedom of speech and of the press, then certainly the judicial department of the government is not clothed with any such authority.

It is suggested by respondent that petitioner was guilty of contempt because he carried a placard announcing that the Sunset Market was "unfair to organized labor—Local No. 17, C. I. O.", for the reason that, as stated in the memorandum opinion of the superior court in adjudging petitioner guilty of contempt, "a place of business may not be picketed if there be no labor dispute between the owner and his employees". Concededly there was no dispute here between the employer and his employees, but the union was carrying on a secondary boycott against such employer, that is to say, there was a labor dispute between certain employee members of Local No. 17 and their employer, Runnymede Farms. The latter concern was selling its products to Sunset Market, and Local No. 17 placed Sunset Market on its "unfair list" because such market refused to accede to the demand of the union that it discontinue the sale of Runnymede products. Such secondary boycott is legal in this state. (*Parkinson* v. *Building Trades Council, supra.*) Being legal, what "offense" was petitioner, a member of Local No. 17, committing when he published the fact that Sunset Market was on the union's "unfair list"? Again let me emphasize that courts cannot enjoin one from doing that which he has a legal right to do. As early as 1908, in the case of *Parkinson* v. *Building Trades Council, supra,* it was pointed out that the word "unfair", as used in labor controversies, is not suggestive of fraud, breach of faith, or dishonorable conduct, but simply indicates that the person or corporation characterized as "unfair" has refused to yield to a demand made by the union. The language of Chief Justice Beatty at page 592 of the case just cited is peculiarly applicable to the present controversy:

"In reference to the word 'unfair' it clearly appears that as employed by the defendants and labor organizations generally, it has a technical meaning well understood by the plaintiff and by all the persons to whom the council sent notices that the plaintiff had been declared unfair. Such declaration means, and in this instance was understood by all parties concerned to mean, not that the plaintiff had been guilty of any fraud, breach of faith, or dishonorable conduct, but only that

it had refused to comply with the conditions upon which union men would consent to remain in its employ or handle material supplied by it.''

I take the position, therefore, that it is not necessary that a direct labor dispute exist between a union and an employer before the union may maintain a boycott and in the exercise of the constitutional rights of its members afford the latter the privilege of speaking and publishing their views with reference to such boycott. This right to boycott is asserted under the constitutional guaranty of freedom of speech and of the press. As was said in *In re Lyons, supra,* at page 298:

'' . . . Of course we have here no labor dispute as that term is generally understood. However, we cannot conclude that fact sufficient to distinguish the cases in principle. In California there is no statute either prohibiting or permitting peaceful picketing, under the circumstances here involved, as is now the case in some jurisdictions. . . . (Citing cases.)

''In this state the right to peacefully picket rests upon the constitutional guaranty of the right of free speech. *We cannot see how the right to peacefully picket, under the guaranty of free speech, could be confined to cases in which there exists a dispute between an employer and organized labor* over hours or conditions of employment, rate of pay, unionization of employees or employment of nonunion men and not extended to a dispute between a business man and any citizen or group of citizens who may differ with him on a question of business policy. The guaranty of the right of free speech is general and extends to every class or group of citizens. . . . ''

Again, in the *Matter of the Application of Bell et al.,* for a writ of *habeas corpus,* decided by the Third District Court of Appeal, March 1, 1940, reported in 37 Cal. App. (2d) 582 [100 Pac. (2d) 339], it is said: ''The right to picket by lawful means is not confined to particular groups or unions, but may be enjoyed by all individuals or classes who desire to thereby convey to the public their opinions regarding labor controversies and causes by presenting persuasive facts to other workmen in a legitimate manner, free from force, violence, intimidation, or threats. It is guaranteed to all on the same basis, upon the theory that it is a lawful exercise of the constitutional guaranty of freedom of the press, speech, and assembly.'' In *Schuster* v. *International Assn. of Machinists,*

293 Ill. App. 177 [12 N. E. (2d) 50], the doctrine just enunciated is approved.

It follows, therefore, that in the absence of any legislation in this state prohibiting peaceful picketing in support of either a primary or secondary boycott except when a labor dispute arises, that the existence of a labor dispute is not necessary to authorize peaceful picketing in either a primary or a secondary boycott. The right is not one exclusively for use in labor cases, but is open to any individual or class, because it constitutes the lawful exercise of the constitutional guaranties heretofore mentioned.

In *Senn* v. *Tile Layers Protective Union Local No. 5,* 301 U. S. 468 [57 Sup. Ct. 857, at pages 859–864, 81 L. Ed. 1229], the Supreme Court of the United States points out that though none of the employees of the employer belonged to defendant union, nevertheless the latter had the right by legal means to seek to induce the employer to unionize his shop by employing members of such union; and with reference to the right of petitioner herein to exercise his right to peacefully advise the public of the fact that Sunset Market refused to accede to the demands of Local No. 17, we might epitomize such right in the closing language of the opinion, that: ''One has no constitutional right to a 'remedy' against the lawful conduct of another.''

We come now to a consideration of the holding in the majority opinion that when the temporary restraining order was issued on November 3d pending a hearing on an order to show cause returnable before the court on November 13th, ''it was petitioner's plain duty to obey the order. Petitioner now seeks to obtain—by means of a writ of *habeas corpus*—a determination of questions which properly would have been adjudicated at the hearing of the Order to Show Cause on November 13th. In the circumstances, the law affords· no such expedience at the expense of respect and due regard for its orderly processes.'' I am not in accord with that statement of the law. In my opinion, it might be a correct statement of the law if the court had jurisdiction of the subject-matter and the parties and the restraining order amounted only to an erroneous application of the court's injunctive powers. But where, as here, the order itself was absolutely void, there is no requirement of obedience thereto. It does not amount to an ''orderly process'' of the court, but is in

fact no process at all. Having in mind the provisions of the first amendment to the Constitution of the United States, which provides that ''Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances''—let us assume that a court should issue a temporary restraining order pending hearing on an order to show cause and which restraining order, issued on a Saturday, should prohibit the holding of religious services on the Sabbath day following: or that the court should in like manner issue a restraining order prohibiting the publication of a newspaper pending hearing on an order to show cause because, according to such restraining order, the newspaper in question was threatening to publish therein a libel against the plaintiff in the action. Would it be contended that the religious group should refrain from the free exercise of its religious services, or that the newspaper should withhold its publication, when the judicial orders were violative of constitutional guaranties and therefore void? The question answers itself. The restraining order, contravening constitutional privileges, need not be obeyed; and the unconstitutionality thereof, appearing on its face, would furnish a complete defense to a contempt citation based upon a violation of such void order. So in the case at bar, when the temporary restraining order was void on its face because it abridged constitutional guaranties and liberties in that it prohibited peaceful picketing, which is lawful in this state, the petitioner was not required to obey it, and its illegality appearing on the face of the order furnished a complete absolution for disobedience thereof. In such circumstances, it seems to me that it matters not what the proceeding may be denominated—whether as a temporary restraining order, injunction *pendente lite*, or by whatever other name—if it is void on its face the person named therein may disregard it and defend against a contempt charge based on a violation of the terms thereof on the ground that the order was void. If such be the case the person adjudged in contempt for a violation of such order is entitled to his discharge from custody through the medium of a writ of *habeas corpus*. As was said by the Supreme Court of the United States in *Bowen* v. *Johnston,* 306 U. S. 19, 25 [59 Sup.

Ct. 442, 83 L. Ed. 455]: ''But if it be found that the Court had no jurisdiction to try the petitioner, or that in its proceedings his constitutional rights have been denied, the remedy of *habeas corpus* is available.'' In *Matter of Johnson,* 9 Cal. App. (2d) 473 [50 Pac. (2d) 452], this division of our court granted a writ of *habeas corpus* when the order of the lower court abridged petitioner's constitutional rights under section 15 of article I of the Constitution of this state.

Concerning the evils arising out of the increasing tendency of courts to resort to injunctive proceedings rather than to permit the exercise of constitutional rights and to allow a determination of the alleged abuse thereof in a trial proceeding, I quote from the dissenting opinion of Justice Kinkead in *McCormick* v. *Local Union,* (1911) 13 Ohio Circuit Ct. Rep. (N. S.) 545, at page 553:

It is a fact that practically all of the encroachments upon the right of free speech and a free press, up to date, have been made by the courts themselves—the sworn defenders of the Constitution. Doubtless they have regarded the urgency of the ends sought as a justification of the extraordinary means employed, even to the extent of denying the right of trial by a jury; but to these extremes I must respectfully decline to go.

''No greater mistake can be made than to underestimate the importance of free speech and of a free press. These rights are among the strongest bulwarks of liberty. It is our duty to guard them with jealous care, and this duty should appeal with peculiar force to the courts. They should never lend their assent or assistance to the weakening or paralyzing of those constitutional rights, without which liberty cannot long exist.

''The Supreme Court of the United States, in a case involving the boundary line of states where marked by rivers, discussed the question of the shifting of the boundary line by reason of the bank of the river slowly wearing away on one side and accumulating on the other. They held that land thus accumulated, by accretion, upon one side of a river belonged to the state upon that side, and that the boundary line between the states shifted accordingly (not so where the river changed its course suddenly, as by a freshet. In such case the boundary line is not altered). In that case the Supreme Court defined the word 'accretion' as meaning 'some-

thing which you can see has taken place, but which you cannot see take place'.

"If some of the courts which have issued injunctions in labor troubles were inquired of as to the source of their power to go to the lengths they have gone in some cases in restraining, by injunction, breaches of the peace and violations of the criminal law generally, they might be compelled to answer 'we got it by accretion—by the gradual wearing away of the power of the executive branch of the government as aided by the regular criminal courts, and a corresponding increase in power, by accretion, on the part of courts of equity, to substitute the injunction for the neglect of duty on the part of executive officers and in the place of jury trials in the regular criminal courts'. They might add 'of course no one saw us get this power, but all now know that the ancient boundary lines have shifted and that we are now exercising the power.'

"We may admit the existence of a power, and still deny the wisdom of exercising it except in extraordinary cases, and then only with very great caution. It is very easy to issue an injunction, and it is a very ready and summary method for the court to determine, without the aid of a jury, whether there has been a violation of the order. No one doubts the simplicity or efficiency of injunction procedure; these are the qualities that render it attractive to people who prefer, when it better suits their own purposes, to omit the limitations and restraints incident to jury trials. Were these same people themselves on trial for a violation of the criminal law, they would stand aghast if any one suggested that the jury be dispensed with and that they be tried by the court—they would be amazed, and justly so, at both the ignorance and the effrontery of any one who would thus seek to deny them their constitutional rights."

As was said by this division of the court in *People* v. *Braun,* 31 Cal. App. (2d) 593, 603 [88 Pac. (2d) 728]:

"The doctrine that respect for the law cannot be inspired by withholding the protection of the law is one which recognizes no exceptions.

"Illegitimate and unconstitutional practices get their first footing by silent approaches and slight deviations from established legal modes of procedure. In a strong dissenting opinion delivered by Mr. Justice Sutherland of the Supreme

Court of the United States in *Associated Press* v. *National Labor Relations Board*, 301 U. S. 103 [57 Sup. Ct. 650, 81 L. Ed. 953], we are counseled to 'withstand all beginnings of encroachment. For the saddest epitaph which can be carved in memory of a vanished liberty is that it was lost because its possessors failed to stretch forth a saving hand while yet there was time.' The acquittal of a guilty person is truly a miscarriage of justice, but the conviction of an innocent person through relaxation of those fundamental legal principles such as the one with which we are here concerned, would be a tragedy. It is the duty of the courts to be watchful for the constitutional and individual rights of the citizen and against any stealthy encroachments thereon.''

Let us not alone boast of the priceless heritage that is ours in the constitutional guaranties and liberties we enjoy, but let us as well uphold and defend them. When tempted by the alluring but fallacious philosophy that ''the end justifies the means'', let us remember the salutary words of Thomas Jefferson in his first inaugural address, when he said, '' . . . freedom of religion, freedom of the press, and freedom of person, under the protection of the *habeas corpus,* and trial by juries impartially selected. These principles form the bright constellation which has gone before us and guided our step through an age of revolution and reformation. The wisdom of our sages and blood of our heroes have been devoted to their attainment. They should be the creed of our political faith, the text of civil instruction, the touchstone by which to try the services of those we trust; and should we wander from them in moments of error or of alarm, let us hasten to retrace our step to regain the road which alone leads to peace, liberty and safety.''

Because the order made by the superior court, for the violation of which petitioner was adjudged in contempt, was an attempted restraint upon his rights and liberties as guaranteed by the Constitution of this state and therefore void, I am of the opinion that petitioner should be discharged from custody.